UNITED STATES of America,

v.

**J. Kevin MENEILLY, David Rodriguez and Richard Rodriguez, Defendants.**

**No. 98–CR–371 (DRH).**

United States District Court, E.D. New York.

Dec. 21, 1999.

Loretta E. Lynch, U.S. Atty., Eastern District of New York, Brooklyn, NY by Ruth Nordenbrook, Asst. U.S. Atty., for U.S.

Joseph W. Ryan, Jr., P.C., Uniondale, NY, for Defendant J. Kevin Meneilly.

Murray Richman, Bronx, NY, for Defendant David Rodriguez.

Douglas T. Burns, Garden City, NY, for Defendant Richard Rodriguez.

**1.** Henceforth in this decision, the entity which provided guard services shall be identified as "SPSI," not "L.M.S.," which is the designa-

### MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending are the following post-trial applications:

1. the motion of J. Kevin Meneilly ("Meneilly"), made pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure (the "Federal Rules"), for a judgment of acquittal as to each of the counts of conviction, and a motion, presumably made pursuant to Rule 33 of the Federal Rules, in which he seeks a new trial, based on, *inter alia,* various purported errors in the charge to the jury and the Court's response to a note from the jury;

2. the motion of David Rodriguez ("D.Rodriguez"), made pursuant to Rule 33 of the Federal Rules, seeking a new trial as to Count One based on a post-verdict conversation between his attorney and juror number six in which she indicated that the jury's verdict as to that Count was not her verdict, and a motion, made pursuant to Rule 29(c) of the Federal Rules, for judgment of acquittal as to the two counts of conviction; and

3. the motion of Richard Rodriguez ("R.Rodriguez"), made pursuant to Rule 29(c) of the Federal Rules, for judgment of acquittal as to the one count of conviction.

### THE INDICTMENT

(1) *Introductory Paragraphs.* The grand jury alleged in the introductory paragraphs of the indictment that:

1. Security Personnel Services, Inc., doing business as L.M. Security, Inc. ("SPSI"), was a corporation, the principal business of which was providing security guard services to businesses and institutions in Nassau, Suffolk, Queens, Kings, New York and Bronx Counties.[1] The main office of SPSI was located at 7001 Brush Hollow Road, Westbury,

tion used in the government's Memorandum in Opposition.

New York. SPSI maintained bank accounts at Citibank and Chemical Bank.

2. The defendant J. KEVIN MENEILLY, an attorney who maintained an office within the premises leased and paid for by [SPSI] at 7001 Brush Hollow Road, Westbury, N.Y., was the majority shareholder of SPSI. The defendant J. KEVIN MENEILLY maintained an attorney escrow account at Republic National Bank (the "Republic Escrow Account"). Edward Kelly was an attorney and accountant employed by the defendant J. KEVIN MENEILLY.

3. Frank Van Cise was a vice-president of SPSI and directed SPSI's regular daily operations. Marianne Van Cise was the payroll clerk of SPSI.

4. L.M. Management Service, Inc. ("L.M.Management") was an inactive corporation associated with SPSI. SPSI maintained a bank account at Republic National Bank in the name of L.M. Management (the "Republic Account").

5. The defendants DAVID RODRIGUEZ [and] RICHARD RODRIGUEZ ... solicited construction contractors engaged in construction projects in New York City as customers for the security services of SPSI, and hired, supervised, and paid the SPSI guards who worked at job sites of those customers.

("Introduction to All Counts" portion of Superceding Indictment 98–CR–371(S–2) at 1–2.)

(2) *Count One.* This Count charged all defendants with conspiring from on or about and between January 1, 1991 and December 31, 1993, to defraud the United States "by impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service (the "IRS") in the ascertainment, computation, assessment, and collection of the income taxes of SPSI and of the defendants DAVID RODRIGUEZ, RICHARD RODRIGUEZ, ... and of other principals and employees of SPSI."

In furtherance of the charged conspiracy, it was alleged that a substantial portion of the checks received by SPSI from its customers were deposited in the Republic National Bank ("Republic") account of L.M. Management. Checks were drawn against that account and were then exchanged for cash. A portion of the cash so generated was distributed to various employees and principals of SPSI, and to the non-Meneilly defendants. No IRS W–2 or 1099 forms were provided to the income recipients, nor were the income payments reported by SPSI to the IRS.

SPSI did not report the portion of its income diverted to the L.M. Management account at Republic, and the non-Meneilly defendants did not report the "off the books" income each received to the IRS.

(3) *Count Two.* The conspiracy to defraud the IRS charged in Count Two similarly has SPSI as its focal point.

The grand jury alleged (i) that certain monies earned by SPSI were diverted from the corporate coffers by being deposited directly into Meneilly's law office escrow account and (ii) that SPSI paid various personal expenses of Meneilly and members of his family in 1991 and 1992, as well as the rent for his law office and the salaries and medical benefits of his law office employees. SPSI's tax returns for the calendar years 1992 and 1993 did not include the corporate income which found its way into Meneilly's escrow account, nor were the corporate payments made on Meneilly's behalf reported in his personal income tax returns for 1991 and 1992.

(4) *Counts Three through Six.* Counts Three through Six charged D. Rodriguez and R. Rodriguez with filing false personal income tax returns for the years 1991 and 1992.

(5) *Counts Ten through Fourteen.* Counts Ten through Twelve charged Me-

neilly with aiding and assisting in the filing of false SPSI tax returns for the calendar years 1991, 1992 and 1993. Counts Thirteen and Fourteen charged him with filing false individual tax returns for the calendar years 1991 and 1992.

## JURY VERDICT

Meneilly stands convicted of the charges in Counts One, Two, Twelve, Thirteen and Fourteen. He was found not guilty as to the charges in Counts Ten and Eleven.

D. Rodriguez was convicted of Counts One and Four. He was found not guilty as to Count Three.

R. Rodriguez was convicted of Count Six. He was found not guilty as to Counts One and Five.

## COURT'S PRE–VERDICT RULE 29 DECISION

At the close of all the evidence and before the case was submitted to the jury, each of the defendants moved pursuant to Rule 29(a) for judgment of acquittal based on the claimed insufficiency of the evidence as to each of the charged offenses. Those motions were denied in a bench decision given on May 3, 1999, which is hereby incorporated by reference. (Tr. at 1390–1424.)

## MENEILLY'S MOTIONS

By way of format, this opinion will address Meneilly's arguments serially by subject consistent with their listing in the table of contents of his Brief in Support.

1. *The Standard Applied by the Court in its Pre–Verdict Rule 29(a) Bench Decision.*

The long-settled standard to be employed in deciding a motion for a judgment of acquittal was recently synopsized by the Second Circuit in *United States v. Guadagna* thusly:

In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most fa-vorable to the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Puzzo,* 928 F.2d 1356, 1361 (2d Cir.1991). All permissible inferences must be drawn in the government's favor. *Id.* In addition, the court must be careful to avoid usurping the role of the jury. As we noted in *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir. 1984), upon a motion for judgment of acquittal, "the Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Id.* (quoting *Curley v. United States,* 160 F.2d 229, 232 (D.C.Cir.1947)). Rule 29(c) does not provide the trial court with an opportunity to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* In fact, if the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Curley,* 160 F.2d at 233.

183 F.3d 122, 129 (2d Cir.1999).

■ Meneilly posits that the settled standard was not employed by me in deciding his pre-verdict Rule 29(a) motion, thereby rendering the resulting decision fundamentally flawed. He maintains that "the Court's own language in the pre-verdict Rule 29 decision—that 'this is not to say there isn't a legitimate dispute' on the individual counts (Tr. at 1421)—was a finding of reasonable doubt and required acquittal." (Def. Meneilly's Br. in Supp. at 2–3.) Proceeding in reverse order, the notion that the existence of a "legitimate dispute" as to the facts in a criminal case—and/or the inferences to be drawn from the facts—constitutes "reasonable doubt" *per se* is incorrect. *Curley v. United States,* 160 F.2d 229, 233 (D.C.Cir.1947);

*Guadagna,* 183 F.3d at 129; *see also United States v. Nersesian,* 824 F.2d 1294, 1314 (2d Cir.1987) ("That the evidence permits inferences that are consistent with innocence does not detract from its sufficiency.").

Meneilly's other point, *i.e.,* that the Court employed the wrong standard, may not be so summarily rejected, and warrants discussion. The bench decision begins with the following correct statement of the applicable standard:

> My task this afternoon concerning the Rule 29 motions is to determine whether any reasonable trier of the fact could find that the government has met or has submitted sufficient evidence to support a conviction of each of the crimes charged in this indictment.
>
> Now, in evaluating the testimony, my role is not to determine credibility or weight. Rather, I am required to construe all the evidence most favorably to the prosecution.
>
> Then the question becomes, so construed, is there any reasonable view of the evidence which would permit the jury to conclude that the government has met its burden of proof.

(Tr. at 1391.)

Notwithstanding the above, however, some of Meneilly's objections to the terminology used thereafter in the bench decision are well taken. For example, I used the term "prima facie case" a number of times later in the bench decision, and used the word "conceivable" (meant by way of an understatement) in describing one reasonable response that the jury could have had to Meneilly's position that his return of SPSI's conceded income to SPSI constituted a "loan" from him to the corporation. Admittedly, the use of such language raises the question of whether the correct standard, as originally stated, was applied in deciding the Rule 29(a) motion. The simple answer is that it was.

The more germane question for purposes of Meneilly's current Rule 29(c) motion is whether a reasonable trier of fact could legitimately conclude, beyond a reasonable doubt, that the government proved each and every element as to each count of conviction. That question will be addressed in the sections that follow.

### 2. *Adequacy of Evidence as to Count Twelve.*

Count Twelve charges Meneilly with aiding and abetting the filing of a false SPSI corporate income tax return for the year 1993. "The critical falsity with regard to the 1993 [SPSI] return," as noted by the government, "was that it (1) did not include $75,802.95 in income received by [SPSI] in 1993 from Williams–Sonoma, a security customer of [SPSI], and (2) mischaracterized some $156,200 which was received by [SPSI] from Williams–Sonoma in 1992, and returned, at least in part, in 1993 as (non-taxable) loans from the defendant Meneilly." (Gov't's Mem. in Opp'n at 14.)

The elements of the offense, as charged to the jury, are that: 1) Meneilly aided, assisted, counseled, procured, advised or caused the preparation and presentation of a tax return for SPSI for 1993; 2) the return was fraudulent or false as to material matter; and 3) Meneilly acted knowingly and willfully. (Tr. at 1734–37.)

Certain facts are not in dispute, including (1) "[t]he failure of the return to report those monies (the monies received from Williams–Sonoma) as income" (Def. Meneilly's Br. in Supp. at 12) and (2) that the Williams–Sonoma checks payable to SPSI, and endorsed by Meneilly into his escrow account, represent the *same* monies later transferred back to SPSI by Meneilly as "loans." (*Id.* at 22.)

SPSI recorded all monies received from customers in its accounts receivable ledger, thus providing the corporation with a running record of payments made and sums still outstanding for services rendered. Some customer payments, however, were not reported in the corporate cash receipts journal, which was the document

used by Vincent Petti ("Petti") in preparing the tax return for 1993, and, incidentally, by his predecessor, Edward Kelly ("Kelly"), with respect to the corporate returns for 1991 and 1992.

The subject payments from Williams–Sonoma were not deposited into an SPSI bank account upon their receipt—which is the reason "they [were not] reflected" in the cash receipts journal (Tr. at 523–24)—but rather were endorsed by Meneilly and placed directly into his escrow account. Considerable testimony was given that this procedure was utilized in an effort to assure that sufficient funds would be on hand to satisfy an anticipated settlement with the United States Department of Labor arising out of the corporation's failure to pay overtime to its employee guards.

Meneilly argues that the record is devoid of any evidence indicating that he instructed Petti not to use the accounts receivable ledger in preparing the corporate returns, or that he knew Petti was using the cash receipts journal for that purpose. From that, coupled with (1) the reason that the Williams–Sonoma payments were directly deposited into his account and (2) that various witnesses labeled the partial return of those monies by him to SPSI as "loans," Meneilly posits that no reasonable trier of fact could conclude that he knowingly and willfully aided and abetted the preparation of the false corporate return for 1993. That argument, including the evidence upon which it is premised, falls far short of establishing the legal insufficiency of the evidence before the jury with respect to the targeted count. It overlooks the formidable contrary trial evidence, including, *inter alia,* the following testimony of Petti who, as noted, prepared the 1993 SPSI return:

Q. How did you ascertain based on your work papers that there was this $156,000 increase in loans from shareholders?

A. These were loans that were marked for Mr. Meneilly, that were put into the corporation.

Q. Calling your attention to Government's Exhibit 121.

. . . . .

Q. . . . . .

What is the column where the loans are reflected?

A.J. Kevin Meneilly, shareholder's loan.

Q. And what's the first amount entered in that column?

A. $70,000

Q. And when is that—what month was that?

A. March.

Q. What is the second number reflected in that column?

A. June.

Q. And what is that number?

A. 21,000

Q. And finally, what's the last?

A. 65,000

Q. Entered when?

A. In August.

Q. What's the total of those three figures?

A. $156,000

Q. . . . . .

The schedule, Government's 121 was prepared by your associate, Miss Palowski; is that correct?

A. Yes.

Q. And then you used the documents that she prepared to prepare the return; is that correct?

A. That's correct. Yes.

Q. Prior to the completion of the 1993 tax return for SPSI, what, if any, discussion did you have with J. Kevin Meneilly concerning those loans?

A. *I discussed these loans and he said that it was loans that he put into the corporation.*

(Tr. at 953–55 (emphasis added).)

■ A reoccurring theme in both Meneilly's argument to the jury and in sup-

port of his current Rule 29(c) motion is that the falsity in the 1993 return was attributable wholly to Linda Koppelman ("Koppelman"), Petti and others, but not to him. Yet, as the above excerpt indicates, a strong argument exists—based on the evidence at trial—that he was a knowing and willful participant in the conceded falsity reflected in the 1993 return. The jury might well have concluded that in advising the accountant that the $156,000 represented "loans that he put into the corporation"—as distinct from the sum's true character as taxable SPSI income—he intended to have that false information reflected in the return. His status as a seasoned lawyer with experience in tax matters [2] would be consistent with such a conclusion by serving to dispel the notion that Meneilly somehow failed to appreciate the significance of his misstatement to Petti.

In sum, there was ample evidence before the jury as to each of the three elements that the government was required to establish beyond a reasonable doubt to prove that Meneilly violated Section 7206(2) as alleged in Count Twelve.

In addition, in seeking a judgment of acquittal as to Count Twelve based on the purported insufficiency of evidence, two additional grounds for the same relief have been advanced, namely: "The Prosecution's Mangled, Erroneous Theorizing to the Jury" (*see* Def. Meneilly's Br. in Supp., Point II(G) at 33), and "[T]he Court Should Have Given the Good Faith and Reliance on Accountant Charge[ ]" (*id.* Part II(H) at 35).

Initially, it should be noted that each of the two purported errors has been misidentified by Meneilly as a ground for a judgment of acquittal, rather than as a basis for seeking a new trial pursuant to

Rule 33. In any event, both grounds lack merit.

A review of the government's summation indicates the absence of any impropriety which would warrant a new trial. With respect to the Court's decision not to give the requested "Good Faith and Reliance on Accountant" charge, my bench ruling during the charge conference is hereby incorporated by reference. (Tr. at 1469–78.) [3]

### 3. *Evidence that Meneilly Was a Member of the Conspiracies Charged in Counts One and Two.*

a) *Counts One and Two.* In Counts One and Two, Meneilly is charged with being a member of a conspiracy, the goal of which was to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes of specified persons and of SPSI.

b) *Elements of Offense.* As to each of the conspiracy counts, the government was required to establish beyond a reasonable doubt: 1) the existence of the conspiracy charged; 2) that Meneilly knowingly and willfully joined the conspiracy; and 3) at least one of the overt acts charged in the indictment was knowingly and willfully committed by at least one conspirator, which overt act was committed to further some objective of the conspiracy. (Tr. at 1704–18.)

c) *Focal Point of Meneilly's Attack as to Each Count.* Meneilly does not attack the existence of the charged conspiracies (Def. Meneilly's Br. in Supp. at, *e.g.*, 38 (Caption of Point III) and 41), nor the commission of the required overt acts. Instead he argues that, viewing all the evi-

---

**2.** The jury heard evidence that Meneilly had an "accounting background," (Tr. at 577), that he prepared the SPSI corporate tax returns before Kelly was hired, (Tr. at 258), and that he prepared tax returns for some of his clients, (Tr. at 473).

**3.** The issue of whether Meneilly's request to charge no. 4(d) is "legally correct," *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999), will not be addressed in view of the absence of a factual predicate for this type of charge to be given.

dence most favorably to the government, the proof merely establishes "nothing more than Mr. Meneilly's 'mere presence at the scene' or 'mere association with conspirators' ... which does not establish that Mr. Meneilly knowingly joined and knowingly participated in the conspiracies." (*Id.* at 39.) Given the focus of Meneilly's argument, the following excerpt from *United States v. Jones* is instructive:

> Because a conspiracy, as the very import of the word suggests, is a clandestine affair whose participants intend to keep it secret, its elements may be established through circumstantial evidence. And, once a conspiracy between two or more defendants is found to exist, though the link between another defendant and the conspiracy need not be strong, the evidence must suffice to permit the jury reasonably to find the element of that defendant's participation— like every element—proven beyond a reasonable doubt. Yet, a defendant who is simply present at the scene of a crime or who knew only of the existence and goals of a ... conspiracy is not thereby guilty of being a conspirator; the government must prove more than that. It must show the defendant knowingly joined and participated in the objectives of the conspiracy. Although an express agreement to participate in the conspiracy is not needed, the proof must demonstrate at least a tacit understanding between the parties to further the violation of the law.

30 F.3d 276, 281 (2d Cir.1994) (citations omitted).

d) *Membership in Count One Conspiracy.* The nature of the conspiracy charged in Count One was provided earlier. (*See supra* at 98.) To partially reiterate, the time frame is alleged to have been from January 1, 1991 through the end of December of 1993. The alleged co-conspirators were Meneilly, D. Rodriguez, R. Rodriguez, government witnesses Frank Van Cise ("Van Cise") and Edward Kelly ("Kelly"), and others. The goal of the conspiracy was identified by the grand jury as being an effort to defraud the United States by interfering with the "lawful functions of the IRS in the ascertainment, computation, assessment, and collection of the income taxes of SPSI" and of D. Rodriguez, R. Rodriguez and "other principals and employees of SPSI."

Meneilly's position is relatively straightforward. Again, he does not claim that there was insufficient evidence to warrant a finding that the conspiracy alleged in Count One existed. Instead, it is his position that the record does not contain sufficient evidence to indicate that he agreed with anyone to thwart the IRS's efforts to determine and collect SPSI's income taxes and/or the personal income taxes of corporate employees and others who received "off the books" income from SPSI.

Before juxtapositioning Meneilly's claim with the trial record, certain preliminary observations are in order. Firstly, although the indictment speaks of the conspirators agreeing to obstruct the IRS in the performance of its tax collecting function with respect to SPSI, the Rodriguezes, *and* other employees and principals of SPSI, if there is sufficient evidence to support the jury's determination of Meneilly's knowing and intentional involvement with the conspiracy's goals regarding SPSI, *or* the Rodriguezes, *or* other employees or principals of SPSI, his conviction under Count One must stand. *See, e.g., United States v. Gomberg,* 715 F.2d 843, 847 (3d Cir.1983) ("A conspirator need not know all the details of the enterprise, ... nor join in all its illegal objectives"); *United States v. Murray,* 618 F.2d 892, 898 (2d Cir.1980). (Tr. at 1710.)

Moreover, "[t]he parties' intent, as well as their agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts and the totality of their conduct." *United States v. Furkin,* 119 F.3d 1276, 1279 (7th Cir.1997). Thus, the mere fact that there is no direct evidence that Meneilly and one or more of his co-

conspirators discussed the effect that their intended conduct would have on the IRS is not fatal to the prosecution's case. The necessary proof of intent may be predicated upon a finding that Meneilly and another conspirator or conspirators had "at least a tacit or mutual understanding that the IRS would not be informed [of the total income received] and the IRS' functions would accordingly be impaired." *United States v. Collins,* 78 F.3d 1021, 1039 (6th Cir.1996).

 And finally, items of evidence should be viewed in conjunction with one another, rather than in isolation, *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), and the weight to be afforded to the evidence falls within the province of the jury, not the Court in deciding a Rule 29 motion. *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996).

With the above principles in mind—as well as *Jones,* 30 F.3d at 281 (*supra* at 103)—attention will now be directed to the trial record. For the reasons previously explained, I will focus on only one of the goals of the conspiracy alleged in Count One, *viz.,* the goal of impeding the IRS in its function of calculating and collecting income taxes from D. Rodriguez and R. Rodriguez.

 The observations that follow are not meant to be an exhaustive review of the evidence, nor an outline of the portions of the record which arguably favor the prosecution or the defense. What is intended is a recitation of *some* of the testimony which—if considered in a common sense fashion and together, rather than in isolation—would constitute a reasonable predicate for the jury's conclusion that Meneilly was a knowing and intentional participant in the Count One conspiracy. Among the items of evidence that fall within that category are:

i. *Meneilly's Managerial Role at SPSI in General*

A. Meneilly was the owner and President of SPSI. (Tr. at 183.) As such, he was involved in the operations of the business on a continuous basis. (Tr. at, *e.g.,* 185 ("I would discuss any problems that we had, you know, with the company with Mr. Meneilly on a daily basis"); *see also id.* at 756–57 (re Koppelman testimony about new customers).) Meneilly played a central, typically controlling role in major corporate decisions (Tr. at 188), including the decision to join forces with Royal Security (Tr. at 198–99, 203–04, 207, 224–26).

B. All mail, including bank statements for both the "on the books" and "off the books" payroll accounts were delivered to Meneilly (Tr. at 254) who, among other things, "reviewed" the monthly bank statements and the canceled checks (Tr. at 253); if Republic had a question concerning the "off the books" L.M. Management account, Mereilly was the person contacted. (Tr. at 247–48; 731; 1197; 1202–04.)

C. The salaries of SPSI's office staff and supervisors on Long Island were established by Meneilly and Van Cise. (Tr. at 256.) Parenthetically, a number of those individuals—such as Van Cise and Koppelman—were paid via two checks, written against the SPSI "on the books" and the L.M. Management "off the books" accounts, respectively (Tr. at 252–53; 842), as was one of Meneilly's personal law office secretaries, Phyllis Gavin, (Tr. at 979).

ii. Circumstantial Evidence of Meneilly's Involvement in Decision to Pay the *Rodriguezes "Off the Books"*

With respect to the merger with Royal Security, D. Rodriguez was the co-owner of that outfit with Hector Ocasio. (Tr. at 203.) Van Cise advised Meneilly that D. Rodriguez wanted to be paid "off the books," while R. Rodriguez and other princi-

pals of Royal Security wanted to be paid partially "on" and partially "off the books" should SPSI and Royal Security join forces. (Tr. at 225.)

As noted by Meneilly, there is no direct evidence that he accepted that part of the merger proposal. However, there is circumstantial evidence to that effect, including the fact that shortly after Van Cise advised Meneilly of D. Rodriguez's demand (1) Meneilly approved the proposed merger and (2) SPSI's payments to the Rodriguezes and other principals of Royal Security matched the pre-merger demands. That scenario, coupled with the other evidence in the record, certainly permits the inference to be drawn that Meneilly at the very least—by knowing acquiescence—tacitly approved the "off the books" component of the SPSI/Royal Security merger.

Clearly, there was ample evidence presented to the jury to support a finding that Meneilly approved SPSI paying the Rodriguezes "on" and "off the books."

Granted, Meneilly is not charged with conspiring to pay persons "off the books." (*See* Def. Meneilly's Br. in Supp. at 39 ("[T]he Court is reminded that the charged illegal *objective* of the conspirac[y] in Count[ ] One . . . was *not* the creation of a shell company, or the shuffling of funds . . . [but rather] to defraud the United States" in the computation and collection of taxes) (emphasis in original).)

Meneilly maintains that the record is devoid of evidence indicating that he was a knowing and willful participant in the goal of impeding the IRS in its efforts to calculate and collect income taxes from D. Rodriguez and R. Rodriguez. In so arguing, Meneilly ignores what it means to pay individuals [4] "off the books," as well as the evidence—previously noted—of his ownership of SPSI and active role in the management of the corporation.

It is common knowledge that paying an employee "off the books" denotes: (1) the absence of any reporting by the employer of such payments to the IRS, (2) a failure by the employer to withhold for federal income taxes and social security, and (3) the non-issuance of Form W–2s to the employees. And that is precisely what happened here with respect to the "off the books" component of the salaries paid to such individuals as the Rodriguezes. (Tr. at 230.)

SPSI's "off the books" payroll scheme obviously impaired the IRS in endeavoring to ascertain and collect taxes from D. Rodriguez and R. Rodriguez. *Furkin*, 119 F.3d at 1280 ("The absence of records [documenting income from illegal gambling machines] obviously made it impossible for the IRS to ascertain, compute, assess or collect Allstar's income taxes.").[5]

The jury could reasonably infer that Meneilly—as a lawyer versed in tax matters—understood the effect that SPSI's "off the books" payments to the Rodriguezes, and the associated false W–2s, would have on the IRS. *Collins*, 78 F.3d at 1038 ("As an initial matter, the jury could consider the financial sophistication of those allegedly involved in the tax conspiracy. The jury could easily find that Col-

---

4. The Rodriguezes have been treated as employees of SPSI in the above discussion, in part because the joint operation was conducted under Meneilly's security license for SPSI. However, even if each is considered as an independent contractor, instead of an employee, the analysis in the text regarding the goal of the conspiracy would run along similar lines due to the non-issuance by SPSI of any report to the IRS reflecting income paid to either of the Rodriguezes.

5. It is possible, albeit unlikely, that an employee paid "off the books" would report the income to the IRS. But even if that occurred, the function of the IRS would still be impaired given the absence of a corresponding report from the employer to match against the income declared by the employee.

lins was aware of his income tax obligations.").

The mere fact that Meneilly had no involvement in the preparation of the Rodriguezes individual 1040 returns does not insulate him from responsibility. *Cf. MacKenzie,* 777 F.2d at 820 ("While appellants [the president and general manager of a painting company charged with aiding and abetting the filing of false tax returns] had nothing to do with preparation of the tax returns of the employees in question [who were paid partially "off the books"], they knew the returns would be fraudulently filed and relied on that fact to conceal their ongoing fraud [*i.e.,* the issuance of false W–2s, the failure to withhold taxes, and to make FICA payments].").

Meneilly is not, as he claims, simply a person in the wrong place at the wrong time, erroneously convicted simply because of his "[s]tatus" and "[p]resence." (Def. Meneilly's Br. in Supp. at 38, 39.) To the contrary, formidable evidence was presented to indicate that he was the chief executive officer of SPSI, and that he knowingly and intentionally "profited," as did the defendants in *MacKenzie,* from the charged wrongdoing. *MacKenzie,* 777 F.2d at 820. As the owner, Meneilly had a significant financial stake in accepting the merger proposal unlike, *e.g.,* Van Cise and Kelly. Royal Security interjected $100,000 of new monies into the operation contemporaneously with the merger, plus the additional customers it provided caused SPSI's revenues to soar. And by paying the Rodriguezes "off the books" with unreported income of SPSI, Meneilly's corporation lessened both its income tax payments and employee-related remittances to the IRS.[6]

■ Here, as in *United States v. Gurary,* the intent to "[i]mped[e] the IRS ...

was part and parcel of the [underlying] scheme." 860 F.2d 521, 525 (2d Cir.1988). Although an unintended effect on the IRS—because of lack of knowledge of the tax laws or otherwise—is insufficient to sustain a conviction, an agreement to impede the IRS—even if the understanding is tacit and only a minor corollary of the overall scheme—will suffice. *Ingram v. United States,* 360 U.S. 672, 675–77, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). Indeed, only rarely, if ever, will an intent to impede the IRS drive or define the illegal enterprise contemplated. *See, e.g., Collins,* 78 F.3d at 1038 ("Because of the way the transaction was structured, DLJ undoubtedly understood that Collins was not intending to report this investment as personal income, because to do so would be tantamount to informing the government that he was extorting money.").

The jury readily could have concluded on the evidence presented that Meneilly agreed—tacitly or otherwise—to the goal of impeding the IRS, which goal was "part and parcel" of SPSI's "off the books" arrangement with the Rodriguezes.[7]

In sum, Meneilly's Rule 29(c) motion as to Count One is without merit.

(e) *Membership in Count Two Conspiracy* Count Two charges Meneilly with having knowingly and intentionally conspired with others to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the IRS in the ascertainment, computation, assessment and collection of his federal income taxes and those of SPSI.

■ He claims, as he did with respect to Count One, that there was no evidence that he "knowingly joined" or "knowingly participated" in the charged tax conspiracy. (Def. Meneilly's Br. in Supp. at 38

---

6. "By underreporting the payroll to the IRS, the corporation avoided significant FICA (social security) taxes for [the] calendar years" involved. *MacKenzie,* 777 F.2d at 813.

7. Given the sufficiency of the evidence as to Meneilly's knowing and intentional partic-

ipation in the Count One conspiracy vis-a-vis the Rodriguezes, his involvement with respect to SPSI's income taxes and the income taxes of other employees and guards need not be addressed.

(Caption of Point III).) That claim is clearly inconsistent with the trial evidence. Meneilly's statement to Petti that his return of a portion of SPSI's income to SPSI represented a "loan" from him to the corporation was not only germane as to Count Twelve, but is also significant for present purposes. Simply put, the jury could have reasonably concluded that Meneilly intentionally mischaracterized the nature of the transaction to Petti so that the Williams–Sonoma monies would not be reflected as corporate income in the SPSI tax return for 1993, which proved to be the case. What Meneilly said (1) furthered one of the goals of the Count Two conspiracy, *viz.,* to defraud the United States by impeding the IRS in the ascertainment and collection of SPSI's income taxes, and (2) is evidence that he was a knowing and willful participant in that conspiracy.

The other goal of the Count Two conspiracy was to obstruct the IRS with respect to Meneilly's personal income taxes. It is undisputed that SPSI paid, *inter alia,* most of the salaries and health benefits of Meneilly's law office staff, the rent for the portion of the suite at 7001 Brush Hollow Road utilized by his law practice, the lease payments for his and his wife's private vehicles, health insurance for his adult sons, as well as the automobile insurance for one of his sons. The payments made for the personal benefit of Meneilly and his wife should have been—but were not—reported on their joint income tax returns. Moreover, SPSI improperly listed many of the expenditures for Meneilly, his wife and children as necessary and ordinary business expenses on its returns.

 Of course, if all of the foregoing were done without Meneilly's knowing and willful participation, he could not properly be labeled a conspirator. In claiming that such was the case, Meneilly maintains that the admitted errors in his returns are chargeable solely to Kelly and that there is an absence of any evidence indicating his involvement in the wrongdoing. Among the items of contrary evidence before the jury were the following:

i. Kelly testified that he prepared Mr. and Mrs. Meneilly's individual 1991 personal tax returns (Gov't's Ex. 4) using "information provided by Mr. Meneilly," including "a computer printout of expenses for his business." (Tr. at 548.)

ii. Kelly took that information and simply entered it in "the tax return where it belonged." (Tr. at 548.)

iii. Included within the 1991 return was a Schedule C, which was based on "some computer generated reports and some handwritten sheets" given to him by Meneilly (Tr. at 549); those materials did not include the benefits that he received from SPSI. (Tr. at 552–53.)

iv. The tax return for 1992 was prepared in the same manner as the one for 1991. "Mr. Meneilly [gave Kelly] the information to prepare the return." (Tr. at 553.) No other books or records were utilized. (Tr. at 553–54.) Kelly's preparation of the Schedule C for 1992 was simplified because "Mr. Meneilly was kind enough to summarize everything on one sheet of paper for me." (Tr. at 554.) Again, the information furnished by Meneilly failed to reflect payments made by SPSI for the benefit of Meneilly. (Tr. at 556–57.)

v. Upon the completion of the return from 1991, it was given to Meneilly (Tr. at 553); upon the completion of the 1992 return, Kelly either gave it directly to Meneilly "if [he] was there" or "if he wasn't; [Kelly would have left] it on his conference table for him to review."

vi. Kelly indicated on cross-examination that the rent for the law office that was paid by the corporation,

together with the salaries paid to Meneilly's law office personnel and other benefits that he received from SPSI, should have been reported as income on Meneilly's Schedule C. (Tr. at 570–73.) [8]

In sum, there was more than adequate evidence before the jury to permit a rational trier of fact to conclude, beyond a reasonable doubt, that the government proved each of the elements of the crime charged, including defendant's knowing and willful participation in the conspiracy charged in Count Two.

(f) *Other Claims of Meneilly re Counts One and Two.* In addition to Meneilly's attack on the legal sufficiency of the evidence with respect to his participation in the two conspiracies of which he stands convicted, he also seeks relief as to those counts on four other grounds, *viz.*, that (1) "The Court Inadequately Responded to the Jury's Question on the Critical Issue of Intent" (Def. Meneilly's Br. at 42); (2) "The Court Erroneously Refused to Give the Requested Charge That L.M. Management was Required to File its own Separate Return" (*id.* at 43); (3) "Mr. Meneilly was Acquitted on Two of the Charged Predicate Acts of the Conspiracies" (*id.* at 44); and (4) the Court failed to give the "good faith and reliance on accountant in-

structions" discussed earlier with respect to Count Twelve.[9]

The first three additional grounds will be discussed seriatim. For the fourth ground, the prior discussion is incorporated by reference.

### i. *Court's Response to Jury Note*

The jury sent a note asking me to clarify the word "tacitly" as used on page 41 of the Charge, and asking if "intent to impede [is] a requirement" under Counts One and Two. (Ct.'s Ex. 10.)

The first question was readily answered. As to the second question, the Court said that "the question cannot be answered yes or no." (Tr. at 1774.) This response, Meneilly urges, requires a new trial. For the following reasons, I disagree.

A. The gravamen of the charged offense is an agreement "to defraud the United States" by obstructing the IRS in the performance of its lawful function vis-a-vis the computation and collection of income taxes. *Furkin*, 119 F.3d at 1279 (the "intent" element of a 18 U.S.C. § 371 "Klein" conspiracy is "'the intent to commit the substantive offense, *i.e.* to defraud the United States'").[10] *See generally 36 Am.*

**8.** Parenthetically, the government was not required to prove that tax revenues were lost as a result of the charged conspiracy. Thus, Kelly's testimony that recording the income, together with the concomitant expenses, would have resulted in some of the transactions being a "wash" (Tr. at 572–73) did not diminish the force of the government's proof, except that such testimony might have raised a question regarding the willfulness underlying Meneilly's conduct. In that regard, however, the jury heard testimony that a portion of SPSI's income was not recorded in its cash receipt journal and was used to fund "off the books" payments as previously discussed. Accordingly, the jury—if it considered the "wash" testimony vis-a-vis willfulness—might have reasonably concluded that Meneilly elected not to report the income received from SPSI, and the related expenses of operating his law practice, on his Schedule Cs for

1991 and 1992, given the corporate practice of illegally underreporting its income.

**9.** The *nature* of the relief sought by Meneilly as to these additional grounds is somewhat muddled. Thus, for example, he erroneously identifies the Court's refusal to charge that L.M. Management was required to file a tax return as "[a]nother ground for acquittal on the Count One conspiracy" (Def. Meneilly's Br. in Supp. at 43) rather than as a purported basis for a new trial. Be that as it may, however, I have treated grounds "1," "2," and "4" above as applications for a new trial under Rule 33 of the Federal Rules, and ground "3" as a further argument under Rule 29(c).

**10.** Meneilly refers to *Furkin* in his Brief in Support, stating: "Although not reflected in the transcript, we furnished the Court with *United States v. Furkin*, 119 F.3d 1276, 1279

*Crim L.Rev.,* "Tax Violations," 1157, 1198 (Summer 1999).

B. The goal of defrauding the United States may be accomplished by the conspirators agreeing to either impede, obstruct, impair, defeat, the IRS in the performance of its duties;

C. In my view, giving the cryptic response of "yes" to the inquiry would have created a risk that the jury would erroneously conclude that the third element of the crime charged was an "intent to impede," not an "intent to defraud."

D. Additionally, the jury's note, in mentioning an "intent to impede," targeted only one of the several alternate means—recited in both the indictment (¶¶ 7 and 16) and the Court's Charge (Tr. at 1709)—by which the conspirators may have knowingly and willfully agreed to accomplish their intended goal of defrauding the United States.

It also warrants mentioning that my response to the note was given after a lengthy discussion with counsel. (Tr. at 1757–73.) After being unable to reach any consensus as to an appropriate response, the Court answered as it did, and then asked counsel if any of them wished to approach the bench. All counsel, but for Meneilly's, said "no" with Meneilly's counsel remaining silent. While it is true that Meneilly's counsel opines now—as he did initially during the pre-answer colloquy (Tr. at 1761)—that the appropriate answer was "yes," he also later voiced the following position during that discussion:

I would respectfully suggest that your Honor read the language in paragraph seven, conspiracy to defraud the United States.

(Tr. at 1761.)

And again, immediately prior to the jury reentering the courtroom, counsel for Meneilly explained:

I support the approach of referring to paragraph seven which says knowingly and intentionally conspired to defraud the U.S. by the means that your Honor outlined. If that doesn't satisfy the jury, they can pen another note. The indictment is knowingly and intentionally conspired to defraud the U.S.

(Tr. at 1772–73.)

These latter two requests by Meneilly that I read paragraph 7 to the jury is difficult to reconcile with counsel's current insistence that my rejection of his earlier proffered response of "yes" warrants a new trial.

In any event, and for the reasons indicated, this ground for the requested relief is found to be without merit.

ii. *Court's Refusal to Charge That L.M. Management was Required to File its own Separate Return*

Earlier in this decision, I described the activities of L.M. Management. As noted, its *single* function was to use diverted, unreported income of SPSI to fund an "off the books payroll" scheme. I had reservations at the time of the charge conference, as I do now, concerning under what circumstances, if any, it would be appropriate for L.M. Management to report as *its* income, income earned—and unreported— by SPSI. *See generally Pollack v. Commissioner of Internal Revenue,* No. 7174–72, 1982 WL 10931 (1982) ("Generally, a corporate entity will not be disregarded for tax purposes so long as it is formed for a substantial business purpose or actually engages in a business activity after its formation.... On the other hand, where a corporation is a mere shell and is not shown to have been either formed or conducted for any significant, nontax business purpose, its existence will be disregarded

(7th Cir.1997), which made clear that 'intent to impede' is required." (Def. Meneilly's Br. in Supp. at 43.) That assertion, however,

does not dovetail with the nature of the intent described by the *Furkin* court as quoted above.

for tax purposes, even though it may be validly incorporated under state law."). Given that circumstance, I declined to give the requested charge. In my view, it was—assuming, *arguendo*, its correctness—unnecessary, and would have been potentially confusing to the jury.

Meneilly posits that this was error because the requested instruction bears on willfulness. However, the Court's charge on willfulness provided a more than adequate framework for the argument in summation that Meneilly lacked the *mens rea* required for conviction to the extent he may have believed that a portion of SPSI's income would be reported in an L.M. Management tax return or returns.

### iii. Acquittal on "Two of The Charged Predicate Acts of the Conspiracy"

■ Firstly, the use of the phrase "predicate acts of the conspiracy" is puzzling since Meneilly was not charged in a RICO indictment. Moreover, the point lacks merit for "jury verdicts are not to be reviewed for consistency," *United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir.1995), and each count must be judged separately in terms of the sufficiency of the evidence. *Id.*

### 4. Attack on Verdicts Under Counts Thirteen and Fourteen.

Counts Thirteen and Fourteen charge Meneilly with having filed false individual tax returns for the years 1991 and 1992, respectively, in violation of Title 26 United States Code Section 7206(1).

The elements of the offense, as explained to the jury are: first, that defendant subscribed and filed a tax return; second, that the return contained a written declaration that it was made under penalty of perjury; third, that defendant did not believe the return to be true and correct as to every material matter; and fourth, that defendant acted willfully. (Tr. at 1725–30.)

Meneilly's attacks on these two counts are: a) "The Court Has Already Found Reasonable Doubt"; b) "Willfulness and Intent Could Not be Established Beyond a Reasonable Doubt"; c) "Due Process"; d) "Reliance on CPA Kelly"; and e) "Sending a Man to Prison for Overpaying the IRS Threatens the Integrity of the Criminal Justice System." (Def. Meneilly's Br. in Supp. at 46, 51.)

■ With respect to argument "a," the term "legitimate dispute" is not, as previously noted, synonymous with "reasonable doubt." It is only when the nature of the "legitimate dispute" rises to the level that a rational trier of fact could not conclude that the government has proven each and every element of the crime charged beyond a reasonable doubt that a judgment of acquittal properly lies. Such is not the case with respect to Counts Thirteen and Fourteen.

With respect to argument "b," Meneilly maintains that:

i. the Court's instructions on willfulness "fall far short of what is required by [*United States v.*] *Cheek*, [498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) ]," in that it failed to indicate that the " 'known legal duty' requirement is that unlike almost any other crime, ignorance of the law is a complete defense in tax cases" (Def. Meneilly's Br. in Supp. at 47), and

ii. the "known legal duty" here was not Meneilly's obligation to report the benefits received from SPSI as income, but rather to report such items specifically "on line 9" of Form 1040 as " 'constructive dividends.' " *Id.* at 49.

The argument regarding the Court's instruction on willfulness is simply wrong as evidenced by the following excerpt from the charge:

> For purposes of the counts presently under discussion ... willfulness has a very specific meaning because tax crimes are different from most other crimes in an important respect.

Ordinarily, a citizen is presumed to know what the law requires of him. However, for tax crimes, ignorance of the law is a complete defense.

Accordingly, willfulness for tax crimes, more particularly the tax crimes charged in the indictment, means the voluntary, intentional violation of a known legal duty.

That means that the Government must prove that the law imposed a duty on defendant, that defendant knew of this duty, and that he voluntarily and intentionally violated that duty.

It is not enough for the government to prove merely that defendant acted with careless disregard or gross negligence, even if others may have been injured by his conduct.

(Tr. at 1729.)

Meneilly's second argument regarding willfulness is also flawed. To maintain, as he does, that the "known legal duty" implicated in Counts Thirteen and Fourteen, was for him "to report certain benefits as 'constructive dividends' on line 9 of his return," poses a myopic position at odds with both the purpose of the "known legal duty" requirement and the nature of the charges returned by the grand jury. (Def. Meneilly's Br. in Supp. at 48.)

The purpose of the requirement in tax cases, as explained by the Second Circuit in *MacKenzie*, is as follows:

> [T]he tax statute standard set forth in [*United States v.*] *Bishop*, 412 U.S. [346] at 360, 93 S.Ct. 2008, 36 L.Ed.2d 941 . . . (" 'willfully,' in those statutes generally connotes a voluntary, intentional viola-

tion of known legal duty"), is designed to separate the purposeful violator from the "well-meaning, but easily confused mass of taxpayers," *id.* at 361, 93 S.Ct. 2008, . . . to avoid penalizing " 'innocent errors made despite the exercise of reasonable care.' "

777 F.2d at 818.

Meneilly urges that simply proving that he knew of his obligation to report SPSI-derived benefits as "income" is insufficient to establish this aspect of willfulness. Instead, in his view, that evidence must be supplemented by proof that he knew precisely where on the return the entry should be made for the government to satisfy its burden. Adoption of that position would fundamentally alter the characteristics of the persons sought to be protected by the known legal duty requirement. No longer would the requirement serve to separate the "purposeful violator" from the "well-meaning" but "confused" taxpayer; henceforth, the ambit of protection would also include the "purposeful violator" who intentionally underreports his known income but—because of the lack of an accounting degree or otherwise acquired accounting expertise—is unaware of whether, *e.g.,* he should report the income he received from a corporation of which he is a shareholder on line 9 of Form 1040 as "dividends," or on line 21 as "other income." [11]

■ Contrary to the position advanced by Meneilly, the "legal duty *at issue*" here concerns Meneilly's awareness—or lack thereof—of his obligation to report the income received from SPSI on his Form

11. Meneilly's reference to *United States v. Borman*, 992 F.2d 124 (7th Cir.1993) and *United States v. Reynolds*, 919 F.2d 435 (7th Cir.1990), as authority for the proposition that "Counts 13 and 14 must be dismissed for failing to state prosecutable offenses," is not persuasive. (Def. Meneilly's Br. in Supp. at 50–51.) In each of those cases, the taxpayer used an IRS form which lacked a line to list the unreported income which served as the basis of the prosecution under 26 U.S.C. § 7206(1). Accordingly, the forms, as filed by

Borman and Reynolds, were literally correct. The Seventh Circuit held in both cases that the mere filing of the wrong form, even if intentional, does not violate § 7206(1). Here, however, the Form 1040 used by Meneilly had lines to report the income he received from SPSI, including one labeled "other income." Under the circumstances, the concept of "literal truth"—which is central to the holdings of *Borman* and *Reynolds*—is irrelevant for present purposes.

1040s for the years 1991 and 1992. (Def. Meneilly's Br. in Supp. at 47 (emphasis in original).)

*United States v. Evangelista,* 122 F.3d 112, 118 (2d Cir.1997), and *United States v. Wallace,* 40 F.Supp.2d 131 (E.D.N.Y. 1999)—identified by Meneilly as "[t]wo recent interpretations of *Cheek* in this Circuit" which supposedly support his position (Def. Meneilly's Br. in Supp. at 47–49)—are inapposite.

Evangelista was convicted of several tax crimes, including being a member of a Klein conspiracy. Among his unsuccessful arguments on appeal was the claim that the district court erred in refusing to give his "reli[ance] on the advice of ... accountant" request to charge. *Evangelista,* 122 F.3d at 116. On page 118 of *Evangelista*—which is the page cited by Meneilly— the Circuit, after discussing the "subjective belief" aspect of the Supreme Court's decision in *Cheek,* concluded that *Evangelista'* invocation of that case in support of his position was "misplaced." Absent from Evangelista is any language, much less a holding, which supports Meneilly's argument as to the nature of the known legal duty involved in Counts Thirteen and Fourteen.

*Wallace* similarly is of no aid to Meneilly. There, the defendant testified that it was his belief that under "IRS regulations ... his wages [were] non-income for federal tax purposes." *Id.* at 132. Based on that belief, he filed a tax return for the calendar year 1995 seeking a refund of the federal taxes he had paid during the prior three years, as well as the return of the monies withheld for taxes during 1995. He was indicted for allegedly making false statements in his application for tax refunds, in violation of 18 U.S.C. § 287.

In ruling on certain charge requests,[12] Judge Weinstein explained:

The gravamen of the charge in the instant case is one of tax law violations. The falsehoods charged depend upon an understanding of legal definitions of such terms as "income" and "citizenship" under the tax code and regulations. *If defendant believed in the definition of these and other terms suggested by his coworker, he would not be lying when he claimed entitlement to full refunds ....* The government must prove beyond a reasonable doubt that defendant knew his view of his responsibilities under the tax law was wrong.

40 F.Supp.2d at 135 (emphasis added).

The definitions of "income," "citizenship," and the other terms upon which Wallace's refund claims were specifically predicated obviously were a necessary part of the charge. Here, however, there is *no* evidence to suggest what Meneilly believed—reasonably or otherwise—as to the reportability for tax purposes of the benefits he received from SPSI. Accordingly, the government was not required, in the language of *Wallace,* "to prove beyond a reasonable doubt that defendant knew his view of his responsibilities under the tax law was wrong," nor was the court required to fashion an instruction addressed to a non-existent dispute as to the meaning of various terms.

In sum, *Wallace* does not support Meneilly's claim that the known legal duty at issue must be defined via reference to the concept of constructive dividends and line 9 of Form 1040.

Meneilly's "constructive dividend" argument is also flawed for it ignores the fact that the perjurious statement identified in Counts Thirteen and Fourteen is that he failed to report the "substantial income [he received] from SPSI" on his Form 1040s for the calendar years 1991 and 1992, respectively. He was *not* charged with intentionally failing to report those benefits as constructive dividends.

---

12. The two charge requests, both granted, were: (1) the government's conscious avoidance charge, (*id.* at 135), and (2) "[d]efen- dant's request for an appropriate instruction [embodying] the conclusions of Cheek on mistake of law," (*id.*).

Given Meneilly's background as a lawyer, and as tax preparer for various clients and for SPSI prior to Kelly coming on board, the jury had more than sufficient evidence to conclude that Meneilly was aware that the multiple financial benefits that he received from SPSI were reportable—either as "dividends" or as "other income"—on his Form 1040 returns.

And finally, Meneilly's arguments on willfulness are not a model of clarity. But to the extent it may be claimed that the government somehow transformed the charges in Counts Thirteen and Fourteen from the intentional underreporting of income to a failure to list such income as dividends on line 9 of the Form 1040 returns, the record indicates otherwise.

Although there was testimony by IRS Agent Doreen Centeri that the appropriate place to report some of the income was on line 9 as dividend income, (Tr. at, *e.g.*, 1163, 1168 and 1169),[13] neither her testimony nor the arguments of the prosecutor served to transmute the nature of the charges returned by the grand jury. By way of example, the government in its opening statement said:

> With regards to the counts that charge false statements on the individual returns of . . . Mr. Meneilly, these charges are based upon the defendant['s] failure to report some or all of [his] income from [SPSI] to the IRS.

(Tr. at 58.)

The prosecutor during summation indicated that the monies should have been reported as constructive dividends, but she did not limit her argument to that position. Rather, she told the jury:

> None of this money was reported anywhere on his return, making the return false as to the material matter, the true amount of his income for each of those years.

(Tr. at 1504.)

In sum, the "known legal duty" implicated by Counts Thirteen and Fourteen pertains to Meneilly's obligation to report as income on his 1040 returns the income he received from SPSI during the subject years. His argument to the contrary is off target, and the jury's verdict as to each count is not subject to vacatur under Rule 29(c).

The first of Meneilly's other arguments as to Counts Thirteen and Fourteen, argument "(a)", *viz.*, "legitimate dispute" signifies "reasonable doubt," has already been discussed.

Argument "(c)," *i.e.*, the due process claim, is patently without merit.

Argument "(d)," concerning the "good faith reliance on Kelly" request to charge, was addressed previously.

And finally, argument "(e)"—*i.e.*, "Sending a Man to Prison for Overpaying The IRS Threatens the Integrity of The Criminal Justice System"—mischaracterizes the nature of the charges of which Meneilly stands convicted.

## DAVID RODRIGUEZ'S MOTIONS

The first of D. Rodriguez's two motions seeks a judgment of acquittal, pursuant to Rule 29(c), upon the claimed insufficiency of the evidence with respect to the counts of conviction, those being Counts One and Four. That application is denied. There was ample evidence for the jury to conclude that each element of each of the two crimes was proven beyond a reasonable doubt. In that regard, the Court's bench decision of May 3, 1999 is hereby incorporated by reference.

D. Rodriguez has also moved for a new trial with respect to Count One, pursuant to Rule 33. In doing so, reference is made to a conversation movant's counsel had with juror number six shortly after the jury was discharged. During that conversation, the juror is reported to have said that she "surrendered her conscientious

---

13. Agent Centeri also testified that, in her view, some of the other benefits received by

Meneilly should have been listed on line 22 of Form 1040 as "other income." (Tr. at 1177.)

conviction that Mr. David Rodriguez should have been acquitted of Count One" and that she was "in effect coerced" into acquiescing in the decision of the other jurors regarding that Count. (*See* May 17, 1999 Letter of Murray Richman, Esq. at 2.)

The jury was polled after the foreperson reported the verdict. Juror number six answered "yes" to the question "is that your verdict," as did the other eleven jurors when asked the same question. Nonetheless, Mr. Richman proffers:

> At the time the verdict was taken juror number six exhibited tremendous difficulty and strain during the polling period. She made faces, she repeatedly hesitated, she covered her face, she acquiesced as to the verdict for Count Number One as to David Rodriguez.

(*Id.* at 1.)

I did not observe any hesitancy by juror number six during the polling process. But even if defense counsel observed some type of hesitancy which was not apparent to me which preceded or accompanied her answer of "yes," the current application is out of sync with the following colloquy that occurred after the jury was polled and before it was discharged:

> THE COURT: .... If counsel could approach for a moment. (Sidebar.)
> THE COURT: It would seem to me the jury should be discharged.
> Is there any reason the jury should not be discharged? ....
> MR. RICHMAN: No, your Honor.

(Tr. at 1800.)

And later, after the jury was discharged, but before the previously-noted conversation between counsel and the juror, each attorney was asked by me if anything further should be done before we recessed. To that inquiry, Mr. Richman answered, "Nothing, your Honor." (Tr. at 1805.)

██ In sum, to the extent that the suggestion is made that the Court should not have accepted the verdict, D. Rodriguez's position is inconsistent with my observations at the time the verdict was taken and, more importantly, with counsel's statements to the Court (1) immediately after the jury was polled and (2) after the jury was discharged but before his conversation with juror number six. Under the circumstances, any claim that the jury should not have been discharged has been waived.

To the extent D. Rodriguez seeks a new trial as to Count One not on the basis that the jury was improperly discharged, but due to the interaction amongst the jurors during the deliberative process, that application runs afoul of the proscription set forth in Rule 606(b) of the Federal Rules of Evidence. *See also Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

For the reasons indicated, the motions by David Rodriguez for a judgment of acquittal as to Counts One and Four, and for a new trial as to Count One, are denied.

### *RICHARD RODRIGUEZ'S MOTIONS*

R. Rodriguez seeks a judgment of acquittal, pursuant to Rule 29(c), on two grounds. Firstly, he cites a perceived inconsistency in the verdict concerning the count of conviction and his acquittal under Count Five. However, as noted earlier, each count must be considered separately in determining a Rule 29 motion, and an inconsistency in the jury's verdict is not a ground to vacate a conviction.

As to R. Rodriguez's sufficiency of the evidence attack on Count Six, there was more than adequate evidence to support the jury's verdict. (*See* partial synopsis of evidence re Count Six set forth in Gov't's Letter of May 20, 1999; *see also* Court's bench decision of May 3, 1999.)

### *CONCLUSION*

For the reasons indicated, the defendants' motions are denied *in toto*.

SO ORDERED.