# United States Court of Appeals
## For the First Circuit

---

No. 00-1110

ANGEL NIEVES AND REBECCA NIEVES,
Plaintiffs, Appellants,

v.

TERENCE J. MCSWEENEY ET AL.,
Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

James B. Krasnoo, with whom Paul J. Klehm was on brief, for appellants.
Brian Rogal, with whom Law Offices of Timothy M. Burke was on brief, for appellee McSweeney.
Douglas I. Louison, Stephen C. Pfaff, and Merrick, Louison & Costello on brief for appellee Beauvais.
Leonard H. Kesten, Jocelyn M. Sedney, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten on brief for remaining appellees.

---

February 27, 2001

---

**SELYA, <u>Circuit Judge</u>.** The appellants, Angel Nieves and his eighteen-year-old daughter Rebecca, claim to be victims of police brutality. They waited a considerable period of time before bringing suit, however, and the district court turned them away, partially on timeliness grounds and partially for failure to proffer a federally-cognizable claim. Their appeal contends that the lower court misunderstood both the operation of the statute of limitations in civil conspiracy cases and the circumstances under which 42 U.S.C. § 1983 provides a vehicle for the maintenance of malicious prosecution claims. Finding these contentions unpersuasive, we affirm the district court's entry of summary judgment.

## I. BACKGROUND

On the evening of May 12, 1994, a disturbance erupted at the appellants' home in Ayer, Massachusetts. The police learned of the tumult from Rebecca's mother (Angel's ex-wife), who telephoned to report that Angel was abusing Rebecca. Officers Terence McSweeney and Dana Beauvais responded to the call. Although the details of what transpired are murky, at least two things are clear: (1) a melee developed involving the appellants and the police officers; and (2) both appellants sustained injuries.

As the fracas ended, two more police officers, Bradley Madge and Leon Avery, arrived at the scene. The appellants were arrested without a warrant and taken to the police station. The authorities detained them for approximately two hours, at which point Angel was released on a $25 bond and Rebecca was released on her own recognizance.

The next day, Officer Edward Denmark, acting on reports filed by McSweeney and Beauvais, swore out criminal complaints against the appellants. One such complaint charged Angel with assault with intent to murder, assault and battery by dangerous weapon, assault and battery on a police officer (two counts), and being a disorderly person. The second charged Rebecca with two counts of assault and battery on a police officer and one count of being a disorderly person. The appellants were promptly arraigned and then released on their own recognizance.

Pretrial proceedings were unremarkable (although the appellants, from time to time, had to attend court sessions). Eventually, the charge of assault with intent to murder was withdrawn. The remaining charges were tried to a jury. On October 27, 1994, the jurors found Angel guilty on the disorderly person charge but acquitted the appellants on all other charges.

Nearly three years later, on October 9, 1997, the appellants brought suit in the United States District Court for the District of Massachusetts against McSweeney, Beauvais, Madge, Avery, Denmark, the chief of police, and the town of Ayer (the Town). The gravamen of their complaint was the multifaceted allegation that the officers conspired to deprive the appellants of their civil rights by using excessive force, arresting them without probable cause, initiating baseless charges, and maliciously prosecuting those charges. After an extensive period of pretrial discovery, the defendants sought summary judgment. In passing upon these motions, the district court proceeded in increments. First, it segregated all the federal-law claims that were based on the events of May 12, 1994 (such as those rooted in excessive force and false arrest) and ruled that they were time-barred. Nieves v. McSweeney, 73 F. Supp. 2d 98, 102 (D. Mass. 1999). Next, the court focused upon the lone federal claim that escaped this proscription: conspiracy to commit malicious prosecution. That claim, the court ascertained, did not allege a violation of a federally-protected right. Id. at 104. Accordingly, the court granted the defendants' motions for brevis disposition, without prejudice, however, to the appellants' pursuit of any state-law claims in a state tribunal. Id. at 106. This appeal followed.

-5-

## II. ANALYSIS

The appellants advance two principal theses in their endeavor to blunt the swing of the summary judgment ax. First, they posit that the entire panoply of events that began on the evening of the arrest and ended with the completion of their criminal trial constituted a single, ongoing conspiracy. Building on this foundation, they argue that the statute of limitations did not begin to run until the commission of the last overt act incident to that conspiracy — the officers' allegedly false testimony at the criminal trial. Since that act took place within the three-year limitation period, the appellants assert that their claims are timely. As a fallback, the appellants argue that even if some of their claims are time-barred, their malicious prosecution claim is not. This claim, they suggest, comprises a viable constitutional cause of action grounded in the Fourth Amendment.

In the sections that follow, we parse the complaint and then measure each of these theories against a familiar standard of review. After all, summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In applying this screen, we construe the record and all reasonable inferences from it in favor of the party who lost below.  Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000); Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  In the process, we afford no special deference to the lower court's views.  See Houlton Citizens' Coalition, 175 F.3d at 184 (explaining that the court of appeals reviews the entry of summary judgment de novo).

## A.  **The Complaint.**

We grapple with only two of the ten counts in the complaint:  counts 1 and 2.  These counts are both premised on 42 U.S.C. § 1983.  They charge Officers McSweeney, Beauvais, and Madge with participating in a conspiracy to violate the appellants' civil rights.[1]  We briefly explain why the remaining counts need not concern us.

Three counts — counts 3, 4, and 5 — allege supervisory liability against the police chief and municipal liability on

---

[1]We mention only McSweeney, Beauvais, and Madge because, in other rulings, the district court dismissed the action as it pertained to Avery and Denmark.  These unappealed rulings rested on different premises and we do not discuss them further.

the part of the Town. The district court initially severed and stayed the prosecution of these counts, and eventually granted summary judgment on them (along with counts 1 and 2). These counts require proof, inter alia, of an underlying constitutional violation. See Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996) (applying this principle in respect to municipal liability); Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995) (applying this principle in respect to supervisory liability). The constitutional violations upon which these counts are premised are those alleged in counts 1 and 2. Thus, if the district court appropriately jettisoned the first two counts of the complaint, the next three also must fail.

By like token, counts 6, 7, and 8 charge violations of 42 U.S.C. § 1985, which in pertinent part confers a private right of action for injuries occasioned when "two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). As the district court noted, the appellants' section 1985(3) claims mirror their section 1983 claims. Nieves, 73 F. Supp. 2d at 102 n.4. Inasmuch as the critical issues in this appeal — whether the appellants sued in a timeous fashion and whether they were

deprived of a federally-protected right — are common to both sets of claims, it would serve no useful purpose to discuss the section 1985(3) claims separately. Those counts can stand only if, and to the same extent that, counts 1 and 2 can stand.

This brings us to counts 9 and 11 (oddly, the appellants' complaint contains no count 10). These counts allege a common-law conspiracy to violate Massachusetts civil rights laws. When the court below entered its summary judgment order, it declined to exercise supplemental jurisdiction over these counts. Id. at 106. The appellants have not attacked the lower court's determination that these counts should be aired in a state forum. Consequently, we need not discuss them in any detail.

## B. Conspiracy.

The appellants allege the existence of a single ongoing conspiracy that extended over a period of more than four months (May 12 through October 27, 1994) and encompassed the officers' excessive use of force, the false arrest, and the ensuing malicious prosecution. Because of the appellants' delay in bringing suit, we must determine when the limitation period began to run on this civil rights conspiracy claim.

Section 1983 does not contain a built-in statute of limitations. McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir.

1995).   Thus, a federal court called upon to adjudicate a section 1983 claim ordinarily must borrow the forum state's limitation period governing personal injury causes of action. Wilson v. Garcia, 471 U.S. 261, 276-80 (1985).  Massachusetts prescribes a three-year statute of limitations for personal injury actions.  See Mass. Gen. Laws ch. 260, § 2A.  We have borrowed this prescriptive period for section 1983 cases arising in Massachusetts, e.g., McIntosh, 71 F.3d at 34, and the parties agree that the three-year period applies here.

The parties do not agree, however, on when the limitation period began to run.  As said, the confrontation between the officers and the appellants occurred on May 12, 1994, yet no suit was commenced until October 9, 1997.  The appellants asseverate that this elapsed time is not fatal: because they configured their claims as arising within the contours of an ongoing conspiracy, the clock did not begin to tick until the conclusion of the criminal trial (October 27, 1994), thus rendering their civil suit timely.  The appellees say that this reasoning elevates form over substance.  Since the triggering events occurred on May 12, 1994, they maintain that the limitation period expired well before the appellants started suit.  For the most part, the district court agreed with the appellees.  See Nieves, 73 F. Supp. 2d at 103-04.  So do we.

-10-

This court determined more than two decades ago that, in the context of a continuing conspiracy to violate civil rights, the statute of limitations runs separately from the occurrence of each civil rights violation that causes actual damage to the plaintiff (as long as the plaintiff knows or should have known of the injury). Hernandez Jimenez v. Calero Toledo, 576 F.2d 402, 404 (1st Cir. 1978). In so holding, we explicitly repudiated the notion, loudly bruited by the appellants in this case, that the statute of limitations for civil conspiracy should run from the date of the last overt act that causes damage to the plaintiff. We stated:

> We recognize that some courts have spoken of the "last overt act" of a civil rights conspiracy as the time from which the statute begins to run, but do not believe those courts meant to depart from the traditional rule in civil conspiracies that the mere fact of a conspiracy does not toll the statute of limitations with respect to earlier clear-cut violations of rights that have not been concealed from the plaintiff.

Id. at 404 n.1 (citation omitted).[2] As the appellants do not suggest that the violations that transpired in the course of

---

[2]The principal authority that the appellants cite in support of their "last overt act" theory is Buford v. Tremayne, 747 F.2d 445, 448 (8th Cir. 1984) (opining that in a conspiracy action "the statute of limitations begins to run from the occurrence of the last overt act resulting in damage to the plaintiff"). Although this decision postdates Hernandez Jimenez, it nonetheless falls squarely within the class of cases contemplated by footnote 1 of the Hernandez Jimenez opinion.

-11-

this alleged conspiracy (such as the excessive use of force and the false arrest) were concealed from them, Hernandez Jimenez controls. See United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991) (holding that in a multi-panel circuit, prior panel decisions generally are binding upon newly-constituted panels).

The appellants attempt to withstand this blow by cloaking themselves in the protective armor of Robinson v. Maruffi, 895 F.2d 649 (10th Cir. 1990). That armor does not fit. The black-letter rule is that the statute of limitations on a malicious prosecution claim begins to run upon the termination of the antecedent criminal proceedings. Heck v. Humphrey, 512 U.S. 477, 489 (1994). Applying this rule, the Robinson court allowed a plaintiff to reach back to include claims of false arrest and false imprisonment within a simple civil conspiracy claim on a "continuing violation" theory, see 895 F.2d at 654-55, but it did so on facts that differ significantly from the case at bar.

The most important distinction between these two cases is that, in Robinson, the conspiratorial agreement arose before the arrest; Robinson contended that the defendants formulated an elaborate plan to frame him for the murder of a police officer

-12-

and then arrested him in furtherance of that plan.[3]  Id. at 655.
This sequencing meant that the arrest was encompassed within the
malicious prosecution conspiracy, and the statute of limitations
therefore began to run on all acts (including the arrest) only
when the criminal proceedings were terminated in Robinson's
favor.

Robinson is the unusual case in which the malicious
prosecution conspiracy began before the victim's arrest and
encompassed it.  The case at bar is vastly different.  Here, it
is undisputed that the officers and the appellants were
strangers to each other until the date of the arrest.  It is
also undisputed that the officers went to the appellants' abode
in response to a third-party call.  Under the appellants' own
theory of the case, the malicious prosecution conspiracy did not
antedate the arrest, but, rather, arose afterwards, sparked by
the officers' perceived need to cover up their unwarranted
brutality.

In comparable situations, we have determined the
conspiracy to be distinct from the events that triggered the
need for it.  E.g., Landrigan v. City of Warwick, 628 F.2d 736,

---

[3]Among other things, the plan involved surveilling
Robinson's associates, apprehending them for petty crimes, and
threatening them with incarceration unless they implicated
Robinson in the murder (for which he was then arrested and
prosecuted).  Robinson, 895 F.2d at 651-53.

-13-

741 (1st Cir. 1980) (finding excessive force and a subsequent coverup to be "separate and distinct wrongs resting on different factual bases"). We reaffirm that view today and, accordingly, reject the appellants' theory of a single, unified conspiracy encompassing excessive use of force, false arrest, and malicious prosecution. This means, of course, that the three-year statute of limitations runs from each civil rights violation identified in the complaint. See Hernandez Jimenez, 576 F.2d at 404.

With these dynamics in mind, we proceed to analyze the operation of the statute of limitations in relation to each of the component violations charged in the appellants' complaint. We conduct this analysis mindful that the question of when a cause of action accrues in a civil rights case is a matter of federal law. Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992); Street v. Vose, 936 F.2d 38, 40 (1st Cir. 1991) (per curiam). Consequently, a section 1983 claim accrues at the moment the plaintiff knows, or has reason to know, of the injury that is the basis for the claim. Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir. 1995).

Following this scheme, it is pellucid that all claims based on the officers' physical abuse or arrest of the appellants accrued at the time that those events occurred — May 12, 1994 — because the appellants had ample reason to know of

-14-

the injury then and there.[4] See Beck v. City of Muskogee Police Dep't, 195 F.3d 553, 558 (10th Cir. 1999) (explaining that claims arising from police action toward a criminal suspect, such as arrest and seizure, are presumed to accrue when the actions occur); Sneed v. Rybicki, 146 F.3d 478, 481 (7th Cir. 1998) (observing that a section 1983 false arrest claim accrues on the day of the arrest regardless of later proceedings); McIntosh, 71 F.3d at 34 (determining that plaintiff's section 1983 claims for assault and false arrest accrued on the date that the events occurred); Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980) (similar). The statute of limitations on these claims expired three years later — months before the appellants filed suit. Accordingly, we uphold the district court's conclusion that the alleged civil rights violations predicated on excessive force and false arrest are time-barred.

### C. **Malicious Prosecution.**

Although two of the appellants' claims have foundered on the shoals of the statute of limitations, one claim escapes

---

[4]We deal here with the mine-run, acknowledging, however, that there may be rare and exotic circumstances in which a section 1983 claim based on a warrantless arrest will not accrue at the time of the arrest. See Calero-Colon, 68 F.3d at 4-5 (Lynch, J., concurring). We are not faced with any such situation today.

this prohibition.  As we noted earlier, a cause of action for malicious prosecution does not accrue until the termination of the criminal proceedings.  See Heck, 512 U.S. at 489.  Since the appellants filed their civil suit within three years of the verdict that marked the end of the criminal case, this differing accrual rule enables them to board the lifeboat of a section 1983 malicious prosecution claim and see how far that craft takes them.

The elements of a common-law cause of action for malicious prosecution are:  (1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice.  Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991).  We assume, for argument's sake, that the appellants made a sufficient showing on these four points to avoid summary judgment.[5]  Even so, more is needed to transform malicious prosecution into a claim cognizable under section 1983.  See Roche v. John Hancock Mut.

_____

[5]Of course, the jury convicted Angel Nieves on one count: being a disorderly person.  The parties hotly dispute whether an acquittal on all counts but one is a termination of the criminal proceedings in Angel's favor (and, thus, satisfies the second prong of the four-part framework for malicious prosecution). Given our ultimate conclusion that no constitutional deprivation occurred, however, we need not resolve this dispute.

Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996) (explaining that "a garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail"). To bridge the gap, the plaintiff also must show a deprivation of a federally-protected right. Meehan v. Town of Plymouth, 167 F.3d 85, 88 (1st Cir. 1999); Roche, 81 F.3d at 254.

The fact that a plaintiff styles her claim as a conspiracy to prosecute her maliciously does not diminish her need to show a constitutional deprivation. Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right. Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988); Landrigan, 628 F.2d at 742. Moreover, it is the plaintiff's burden to identify the specific constitutional right infringed. See Albright v. Oliver, 510 U.S. 266, 271 (1994). In the end, this requirement scuttles the appellants' claim.

It is perfectly clear that the Due Process Clause cannot serve to ground the appellants' federal malicious prosecution claim. No procedural due process claim can flourish in this soil because Massachusetts provides an adequate remedy for malicious prosecution. See Roche, 81 F.3d at 256 (citing,

-17-

inter alia, Beecy v. Pucciarelli, 441 N.E.2d 1035, 1038-39 (Mass. 1982)). Similarly, a plurality of the Supreme Court has concluded that "substantive due process may not furnish the constitutional peg on which to hang" a federal malicious prosecution tort. Albright, 510 U.S. at 271 n.4. We have followed the Court's lead in this respect, see, e.g., Roche, 81 F.3d at 256 (holding that there is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution), and we hew to that line today.

The Fourth Amendment, however, provides potentially more fertile soil. It is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation. See Albright, 510 U.S. at 271-75; Britton v. Maloney, 196 F.3d 24, 28 (1st Cir. 1999), cert. denied, 120 S. Ct. 2198 (2000); Singer, 63 F.3d at 114. As in previous cases, e.g., Britton, 196 F.3d at 28; Roche, 81 F.3d at 256 n.5, we will assume without deciding that malicious prosecution can, under some circumstances, embody a violation of the Fourth Amendment and thus ground a cause of action under section 1983. We turn, then, to a consideration of whether the facts of this case suffice to sustain such a claim.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. For a public official to transgress the Fourth Amendment through the initiation and pursuit of criminal charges, the prosecution of those charges must at a bare minimum have occasioned a deprivation of liberty consistent with the concept of a seizure. Britton, 196 F.2d at 28; Singer, 63 F.3d at 116.

The appellants assert that they were "seized" for Fourth Amendment purposes from the time of their arrest through the end of their criminal trial. But this assertion rests on a flawed premise. The tort of malicious prosecution permits damages for a deprivation of liberty — a seizure — pursuant to legal process. Heck, 512 U.S. at 484; Calero-Colon, 68 F.3d at 3. Generally, the offending legal process comes either in the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure). Singer, 63 F.3d at 117. The first of these variations has no bearing here. The appellants were arrested without a warrant and, thus, their arrests — which antedated any legal process — cannot be part of the Fourth

-19-

Amendment seizure upon which they base their section 1983 claims.

Meehan aptly illustrates this point. There, the plaintiff attempted to base a section 1983 malicious prosecution claim on his warrantless arrest. 167 F.3d at 89. We rejected this initiative, stating:

> Meehan may not bring a malicious prosecution claim based upon his arrest because his arrest does not constitute the "initiation of proceedings" against Meehan. . . . Meehan's arrest was not made pursuant to an arrest warrant. Meehan cites no authority for the proposition that a malicious prosecution cause of action may be based upon a warrantless arrest.

Id. at 89-90 (internal citation and footnote omitted). Accord Singer, 63 F.3d at 117.

This leaves the appellants with the task of showing some post-arraignment deprivation of liberty, caused by the application of legal process, that approximates a Fourth Amendment seizure. Following a thoughtful analysis, the district court concluded that the appellants could not vault this hurdle. Nieves, 73 F. Supp. 2d at 105. We agree.

It is undisputed that the first time the appellants were subject to legal process was on May 13, 1994 (when criminal complaints against them issued). Taking the facts from the standpoint most favorable to the appellants, as we must, see

Houlton Citizens' Coalition, 175 F.3d at 184, the following events occurred after that time: the appellants were released on their own recognizance; they suffered the stress and anxiety of knowing not only that serious criminal charges were pending against them, but also that their reputations had been sullied; they appeared before the criminal court a number of times in the pretrial period; and they endured the trial. The question thus becomes: do these strictures, in the aggregate, constitute a Fourth Amendment seizure sufficient to ground a section 1983 malicious prosecution claim?

In the classic formulation, a Fourth Amendment seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). In this case, there was no physical force during the post-arraignment period. The appellants' position, by default, is that their liberty was restrained by a show of authority, manifested most clearly by a series of orders to appear before the court. By obeying these orders, the appellants assert, they yielded to a show of authority, completing the seizure. Cf. California v. Hodari D., 499 U.S. 621, 626 (1991) (holding that a show of authority by a government actor does not constitute a seizure unless the subject yields or submits to it).

This proposition is counterintuitive. The very idea of defining commonplace conditions of pretrial release as a "seizure" for Fourth Amendment purposes seems to stretch the accepted meaning of the term. After all, a seizure under Fourth Amendment jurisprudence is generally a discrete event, quintessentially an arrest, see id. at 624, or at least a physical detention, see Terry, 392 U.S. at 16-19. Thus, seizure jurisprudence traditionally has centered on the initial deprivation of liberty that a seizure of the person entails. Since "[a] seizure is a single act, and not a continuous fact," Hodari D., 499 U.S. at 625 (quoting Thompson v. Whitman, 85 U.S. (18 Wall.) 457, 471 (1873)), run-of-the-mill conditions of pretrial release do not fit comfortably within the recognized parameters of the term.

Moreover, if the concept of a seizure is regarded as elastic enough to encompass standard conditions of pretrial release, virtually every criminal defendant will be deemed to be seized pending the resolution of the charges against him. That would mean, in turn, that nearly every malicious prosecution claim could be brought before a federal court under the aegis of section 1983. We believe that this is much too ambitious a view of the law. Cf. Roche, 81 F.3d at 256 (indicating that "garden-

-22-

variety" malicious prosecution claims are appropriately left to state courts).

Despite these obvious conceptual problems, a concurring opinion in Albright fully supports the claim that the appellants were "seized" within the purview of the Fourth Amendment based on their compliance with the obligation to appear in court at the commonwealth's command. In that concurrence, Justice Ginsburg advocated the position that an individual who is released pending trial should be deemed "seized" because such a person "is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." Albright, 510 U.S. at 279 (Ginsburg, J., concurring). Justice Ginsburg understands this seizure to last as long as the charges against the individual remain unadjudicated.[6] Id. at 280.

Notwithstanding the eminence of its sponsor, the view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law. No other Justice joined Justice Ginsburg's opinion, and "the question whether the Fourth Amendment continues to provide individuals

---

[6]Justice Ginsburg went to some lengths to make this point, as Albright itself involved a defendant who had been required to post bond and had been placed under travel restrictions. Albright, 510 U.S. at 268.

-23-

with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins," Graham v. Connor, 490 U.S. 386, 395 n.10 (1989), remains unresolved by the Supreme Court. Moreover, two of our sister circuits have explicitly rejected Justice Ginsburg's theory. See Riley v. Dorton, 115 F.3d 1159, 1162 (4th Cir. 1997) (en banc); Reed v. City of Chicago, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996). Another has expressed grave reservations concerning it. See Whiting v. Traylor, 85 F.3d 581, 584 (11th Cir. 1996).

This court, too, has declined to embrace the whole of Justice Ginsburg's view. See Britton, 196 F.3d at 29-30. In that case, a plaintiff alleging a section 1983 malicious prosecution claim argued that he was seized for Fourth Amendment purposes because he had received a summons in the mail. Id. at 29. Although Justice Ginsburg clearly would have accepted this contention, see Albright, 510 U.S. at 279 (Ginsburg, J., concurring) (observing that a defendant is "seized" when bound to appear for trial by a summons), we spurned it, writing:

> Absent any evidence that Britton was arrested, detained, restricted in his travel, or otherwise subject to a deprivation of his liberty before the charges against him were dismissed, the fact that he was given a date to appear in court is insufficient to establish a seizure within the meaning of the Fourth Amendment.

Britton, 196 F.3d at 30. In making this determination, we relied on cases such as Brower v. County of Inyo, 489 U.S. 593 (1989), in which the Court held that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," id. at 596, and that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied," id. at 597 (emphasis omitted). We were unable to reconcile the limited demands that the summons imposed on Britton with concepts such as "physical control" and "termination of freedom of movement."

The case before us, though somewhat stronger, bears a fairly resemblance to Britton. Canvassing the relevant time frame, we find no evidence that the appellants were held after the initiation of criminal proceedings, required to post a monetary bond upon arraignment, subjected to restrictions on their travel, or otherwise exposed to any significant deprivation of liberty. While the imposition upon the appellants here was marginally greater than the imposition upon Britton — they were required to appear several times at the court's behest (including an appearance for trial) — the fact remains that the conditions of pretrial release to which they were subjected simply do not approach the level necessary to constitute a Fourth Amendment seizure.

-25-

In an effort to persuade us to a contrary conclusion, the appellants point to three decisions that have given some degree of traction to Justice Ginsburg's concurrence. Their bellwether case is Evans v. Ball, 168 F.3d 856 (5th Cir. 1999). There, the Fifth Circuit determined that the plaintiff in a Bivens action had alleged a seizure within the meaning of the Fourth Amendment based on the following: (1) the plaintiff's receipt of a summons to appear and answer to criminal charges; (2) his being fingerprinted, photographed, and forced to sign a personal recognizance bond; and (3) his being required to report regularly to pretrial services, obtain permission before leaving the state, and provide federal officers with financial and identifying information. Id. at 860-61. The court concluded that the restrictions imposed on the plaintiff diminished his liberty interest enough to render him seized under the Fourth Amendment. Id. at 861.

The appellants' other two cases are cut from much the same cloth. In Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998), the court, calling it a "close question," decided that a section 1983 plaintiff had been seized in the constitutional sense where he was required to post a $10,000 bond, attend all court hearings including his trial, contact pretrial services weekly, and refrain from traveling outside New

Jersey and Pennsylvania. Id. at 222. So too Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997), a two-to-one decision in which the panel determined that a plaintiff's obligation to attend court appointments, combined with a prohibition against leaving New York, constituted a seizure within the meaning of the Fourth Amendment. Id. at 945.

We need not comment upon the soundness of these decisions. For present purposes, it suffices to say that they are materially distinguishable. To mention the most glaring difference, all three cases involved definitive restrictions on the right to travel, and each of the courts in question placed heavy emphasis on the salience of such a restriction as a linchpin of a seizure. See Evans, 168 F.3d at 861-62; Gallo, 161 F.3d at 224; Murphy, 118 F.3d at 945-46. Conversely, no such restriction was in force vis-à-vis the appellants. For this reason, and because the aggregate deprivations involved in Evans, Gallo, and Murphy substantially exceeded the overall deprivation imposed here, we regard the cases as inapposite.

That ends this aspect of the matter. Given the relatively benign nature of the pretrial release conditions involved in this case, we hold that the appellants did not suffer a post-arraignment seizure within the meaning of the Fourth Amendment. It follows inexorably that, in the absence of

-27-

an anchoring constitutional violation, the appellants' section 1983 malicious prosecution claim topples.

## III. CONCLUSION

We need go no further.[7]  A ripe civil rights suit was left to rot.  Most of the appellants' claims are barred by the operation of the statute of limitations; those that are not fail for lack of a constitutionally significant deprivation.  We therefore affirm the district court's entry of summary judgment on the appellants' federal claims.

**Affirmed.**

---

[7]The appellants also complain that the district court frustrated their efforts during pretrial discovery to question McSweeney about other incidents of police brutality.  They claim that they had a good-faith basis for the queries (a 1997 investigatory report concluded that McSweeney had demonstrated a pattern of needless provocation and excessive force in making arrests) and that the information sought was relevant.  But we have concluded that the grant of summary judgment must be upheld based on the statute of limitations (as to some claims) and the lack of a constitutional deprivation (as to the remaining claims), see supra Part II, and no amount of discovery anent other incidents can alter this result.  It is, therefore, a moot point whether the discovery limitation was right or wrong.