Sherrill B. "TOM" MYERS, Plaintiff,

v.

**Sgt. David A. SHAVER,
et al., Defendants.**

**No. 7:02CV00654.**

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 21, 2003.

Hilary K. Johnson, Hilary K. Johnson, PC, Abingdon, VA, for plaintiff.

James Walter Hopper, Office of Atty. Gen., Richmond, VA, for defendant.

## MEMORANDUM OPINION

WILSON, Chief Judge.

This is an action pursuant to 42 U.S.C. § 1983 by plaintiff, Sherrill B. Myers (Myers), a former Virginia State Trooper against his former superiors, Sgt. David A. Shaver, Sgt. Patrick L. Kirtner, 1st Sgt. Terry D. Marshall, Sgt. Michael David Honaker, and Lt. Curtis L. Bailey, for allegedly falsely arresting and charging him with brandishing a firearm at his wife and for failing to pay him for annual leave. The court finds that defendants did not violate Myers' liberty or property interests and that qualified immunity shields defendants from this suit. Accordingly, the court will enter summary judgment for defendants.

### I.

During a heated argument between Myers and his wife Paula Myers (Paula) on January 5, 2001, Myers picked up his service pistol. According to Myers, Paula had stated she did not want to live any longer, and he wanted to show her that she did not want to commit suicide. Holding the pistol in his hand, Myers suggested that he could shoot her and then himself or she could shoot him and then herself. Myers maintains that he never pointed the pistol at his wife and had no intention of using it or letting her use it. Myers Letters, Feb. 8, 2001 and Feb. 14, 2001 at 1

(Def.'s Mem. in Supp.: Attachs. 11 and 12 of Ex. 1 to Attach. 3).

Melissa Parsons, a dispatcher with the Virginia State Police, purportedly had a conversation with Paula's sister-in-law, which Parsons, in turn, repeated to Terry Marshall, a Virginia State Police Sergeant on January 9, 2001. Parsons Aff. at 1 (Def.'s Mem. in Resp. to Pl.'s Crossmot. for Summ..J.: Attach. 2); Marshall Aff. at 1 (Attach.3). Paula purportedly told her sister-in-law that Myers "pointed a gun at her head and threatened to kill her." Marshall Aff. at 1 (Attach.3). Marshall relayed the story to Virginia State Police Sergeant Michael Honaker.

With similar information in hand from a confidential informant, on January 10, 2001, Virginia State Police First Sergeant David Shaver called Paula's mother Mrs. Dorothy Walters to ask her if she knew anything about the incident. According to Shaver, Mrs. Walters stated:

> Paula told me Monday at work what happened. They got into an argument and he flew off the handle and put a gun to her head.

Mrs. Walters also stated that Paula told her Myers had done the same thing a few months earlier. Mrs. Walters stated she did not want to give any further information because she did not want to get Myers in any trouble. Shaver then asked Mrs. Walters to have Paula call him. Shaver Aff. at 1–2 (Def.'s Mem. in Supp.: Attach. 1).

Paula called Shaver at approximately 4:00 p.m. that same day. According to Shaver, Paula said that she and Myers had a heated argument, that Myers got a gun, that Myers said he would "end it all," that she could "kill him first" or he would kill her and that he pointed the gun at her, although she was not sure where he pointed it, perhaps in the "upper chest area." *Id.* at 2.

That evening Shaver and Honaker interviewed Paula at her mother's house while Myers worked the 3 p.m. to 11 p.m. shift. *Id.* at 2. According to Shaver, Paula recounted the same story, although in greater detail. Following the interview Shaver traveled to the Smyth County Courthouse where he charged Myers with "holding, pointing, or brandishing" a firearm in violation of Virginia Code § 18.2—282 which provides in pertinent part that "it shall be unlawful for any person to point, hold or brandish any firearm ... in such manner as to reasonably induce fear in the mind of another ...." According to the criminal complaint in the Smyth County Juvenile and Domestic Relations District Court, Shaver, the complainant, had "reason to believe" that Myers violated § 18.2—282 based on the following facts which he stated were "true and accurate to the best of [his] knowledge and belief":

> I had received information that S.B. Myers had pointed a gun at his wife Paula at their residence during a heated argument. He stated to her "well just end it all here, both of us, you shoot me or Ill shoot you." Paula Myers provided the statement of what had occurred.

Warrant (Def.'s Mem. in Supp.: Ex.1 to Attach. 1). Based on the complaint, the magistrate "found probable cause to believe that [Myers] committed the offense charged" and issued an arrest warrant at 7:16 p.m. The arrest warrant provided, however, that the serving officer, in his discretion, could execute it "by summons." Shaver also obtained an "emergency protective order" pursuant to Virginia code § 16.1—253.4 enjoining further acts of "family abuse" and contact with Paula.

That same day Myers was working the 3 p.m. to 11 p.m. shift. Before going to interview Paula, Shaver instructed Marshall "to attempt to keep Myers at the

area office, and discourage him from making telephone calls to his home while Honaker and [he]" investigated further. Marshall Aff. at 1–2 (Def.'s Mem. in Resp. to Pl.'s Crossmot. for Summ. J.: Attach. 3). When Myers arrived at the office at the beginning of his shift, Marshall asked him to have a seat and remain there until Shaver returned. Marshall explained that they were conducting an administrative investigation which they would discuss with him further when Shaver returned. "During the evening, Myers left the office on several occasions to use the restroom, speak with dispatchers, and to walk outside." *Id.* at 2. Later in the evening Marshall and Myers left the office together for dinner, although Myers refused to eat.

Upon returning to the office after dinner, Myers asked permission to make a phone call to Paula. Marshall apprised Myers that he had been instructed "to keep him from making telephone calls to his wife, and preferred that he did not do so. Myers asked whether he was under arrest. Marshall advised Myers that he was not . . . ." *Id.* Myers asked if Marshall "would deny him sick leave if requested" and Marshall said he would not. Myers also asked what Marshall would do "if he simply walked out of the Area Office." Marshall responded that he would not restrain Myers and that Myers "needed to do what he felt would be in his best interest." *Id.*

Shaver and Honaker returned to the office and Shaver served the warrant and protective order on Myers. Shaver executed the warrant by summoning Myers in lieu of arresting him. Honaker Aff. at 2 (Def.'s Mem. in Supp.: Attach. 2); Warrant (Def.'s Mem. in Supp.: Ex. 1 to Attach. 1). Shaver then took possession of Myers' patrol car and service revolver and Lieutenant Bailey suspended Myers without pay "pending completion of an official investigation." Letter from Lt. Bailey to Myers, January 10, 2001 at 1 (Def.'s Mem. in Supp.: Attach. 3 of Ex. 1 to Attach. 3). Shaver and Honaker then drove Myers home. On the way home Myers spoke about the heated argument and admitted to having a firearm in his hand. He denied, however, pointing the firearm at Paula. Shaver Aff. at 3 (Def's Mem. In Supp.: Attach. 1).

The next day the Smyth County Juvenile and Domestic Relations District Court dissolved the emergency protective order on the joint motion of Trooper and Paula Myers. Smyth County District Court Order (Def.'s Mem. In Supp.: Attach 7 of Ex. 1 to Attach. 3). On February 26, 2001, Paula testified at the criminal trial:

> I can't honestly say that he pointed it at me. I felt like he was offering it-handing it to me to shoot him, not to shoot me.

Trial Transcript at 16 (Pl.'s Br. in Opp'n: Attach. B). The court, accordingly, dismissed the charge.

On March 7, 2001 the Department changed Myers' status from "suspension without pay" to "paid administrative leave," and on March 14 Myers' Acting Division Commander, Lieutenant Bailey, charged Myers with violating the standards of conduct of the Department of State Police ("Department") and recommended that the Department terminate his employment. The Department gave Myers written notice of the charges against him and scheduled a meeting with Jerry S. Conner, the Deputy Director for the Bureau of Administrative and Support Services for the Department, in order to give Myers "an explanation of the evidence supporting the charge and to allow [Myers] the opportunity to make an oral response." Notice at 2 (Pl.'s Br. in Opp'n: Attach. H). Conner held the meeting on April 16, 2001. Bailey, Myers, and Myers'

attorney, Randolph D. Eley, Jr., attended. The charges were explained to Myers and his attorney, and they were permitted to respond. Conner Aff. at 1–2 (Def.'s Mem. in Supp: Attach. 4).

On April 23, 2001, Myers called Conner and asked him if he would consider permitting him to resign in lieu of termination. *Id.* at 2. Conner indicated that he would, and later that same day Eley called and said that Myers would resign effective April 30, 2001, if the Department "would execute an agreement concerning the release of his employment history." *Id.* The agreement, which the parties executed on May 8, 2001, also specifically recited that the parties acted "freely and voluntarily" without "coercion, force, pressure or undue influence." Agreement at 2 (Def.'s Mem. in Supp.: Ex. 1 to Attach. 4).

In accordance with its agreement, the Department "made a payment to [Myers] that included leave balances for overtime, compensatory leave, and sick leave." Qualification Ruling of Director of Dep't of Employment Dispute Resolution at 2 (Pl.'s Br. in Opp'n: Attach. I). It refused to pay him for the annual leave he used during the period he was suspended without pay, prompting Myers to file a grievance on August 27, 2001 to recover for the lost leave. The Director of Virginia's Department of Employment Dispute Resolution concluded that Myers voluntarily resigned and that the Department's grievance procedure did not apply to employees who had voluntarily resigned. The Director expressly noted, however, that he was not deciding that Myers was "not entitled to the reinstatement of his annual leave." *Id.* at 3. In fact, he believed the Department was required "to restore the annual leave." *Id.*

This § 1983 suit followed some additional wrangling over the Department's failure to pay for annual leave. Myers now main-

tains that defendants, motivated to retaliate against Myers for giving Shaver's wife a speeding ticket, fabricated the allegation that he pointed the gun at her. Paula also unequivocally states that she never told Shaver and Honaker that her husband pointed the gun at her.

Myers' complaint fails to separately and succinctly allege claims for relief. Rather, the complaint alleges facts interspersed with allegations that defendants wrongly deprived Myers of his liberty and property without due process of law. Liberally construed, however, Myers' complaint alleges that defendants wrongfully detained him at police headquarters before charging him with an offense, summoned him without probable cause based on a false affidavit, maliciously prosecuted him, made false allegations that resulted in his termination and loss of future employment, and failed to compensate him for lost annual leave. The court considers each of these claims in turn.

## II.

■ Myers incorrectly claims that defendants detained him at police headquarters in violation of the Fourth Amendment. The uncontradicted evidence before the court discloses that the defendants detained Myers at the area office as an implied condition of his employment and that they neither physically restrained him nor implicitly or explicitly threatened to use force to keep him there. These facts implicate none of the touchstones of a Fourth Amendment seizure.

The uncontested evidence establishes that during Myers' shift on the day in question, Marshall advised Myers that he was not under arrest, that he would not restrain Myers, and that Myers could take sick leave if he felt it would be "in his best interest." Myers seems to argue, however, that the direct order of his superior to

remain at the area office as an implied condition of his employment was a seizure under the Fourth Amendment.[1] Myers' argument erases the line "between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state," *Driebel v. Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002), and thereby, misconstrues Fourth Amendment jurisprudence. The words of the Seventh Circuit in a case involving police officers summoned to headquarters and questioned at length about their possible involvement in a crime are instructive:

> We hasten to emphasize that nothing in the Fourth Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector. Thus, in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state .... We reject the appellant officers' argument that a patrolman is seized, within the meaning of the Fourth Amendment, at the time that he is ordered to report for questioning at a designated, centralized area, such as the headquarters for the internal affairs department (wherever it may be located) or some other suitable location determined by the superior officer.

*Driebel*, 298 F.3d at 637–39.

The bedrock of the Seventh Circuit's reasoning is quite simple: "Since the Fourth Amendment does not protect against the threat of job loss, the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate officers would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers." *Driebel*, 298 F.3d at 642 (emphasis in original). It follows that since Myers clearly understood that Marshall would not physically restrain him from leaving the area office, Marshall had not "seized" him within the Fourth Amendment's meaning. Therefore, the court rejects Myers' claim that defendants detained him at the area office in violation of that amendment.[2]

■ Even if the circumstances of Myers' alleged detention at the area office were found to be a Fourth Amendment seizure, at the very least the circumstances were ambiguous, transgressing no bright line. "[W]hen the legality of a particular

---

**1.** Indeed, his supervisor ordered him to submit to a psychiatric evaluation which he contends was tantamount to an unlawful seizure.

**2.** Since defendants did not seize Myers, the court does not reach defendants' contention that they had probable cause to detain him. It is worth noting, however, that even viewing the information defendants had in the light most favorable to Myers, defendants' contention is not without substance. From the phone conversations with Paula and her mother, they knew that Myers had a heated argument with his wife, had a pistol in his hand, and told his wife he would kill her or she could kill him. Although Paula denies telling any of the defendants that Myers pointed the pistol at her, it is unrefuted that Paula's mother told Shaver that Paula told her

Myers "flew off the handle and put a gun to her head," and that this information corroborated the information obtained earlier by state police dispatcher Parsons.

Myers also contends, however, that Virginia law prohibited defendants from arresting Myers for a misdemeanor committed outside of their presence even if they had probable cause. Pl.'s Br. in Opp'n at 6. Like Myers' other arguments, this one misses the mark. Section 1983 redresses violations of federal not state law. Therefore, in accordance with the Fourth Circuit, the arresting officer "cannot be liable under § 1983 unless he also violated the federal constitutional law governing warrantless arrests." *Street v. Surdyka*, 492 F.2d 368, 370–71 (4th Cir.1974); *see Clark v. Link*, 855 F.2d 156 (4th Cir.1988).

course of action is open to reasonable dispute, an officer will not be subjected to trial and liability. Under the doctrine of qualified immunity, officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Figg v. Schroeder*, 312 F.3d 625, 636 (4th Cir.2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992)). In short, the court finds that it was objectively reasonable for defendants to believe they had not "seized" Myers within the meaning of the Fourth Amendment. It follows that qualified immunity shields them from liability.

### III.

■ Myers second claim alleges that Shaver summoned him without probable cause in violation of the Fourth Amendment. The court finds that because Shaver issued a summons in lieu of arresting Myers, Shaver did not "seize" Myers within the meaning of the Fourth Amendment. A summons to answer charges on a criminal complaint is not, by itself, a seizure under the Fourth Amendment. *Britton v. Maloney*, 196 F.3d 24 (1st Cir.1999). Furthermore, even if Shaver did "seize" Myers, that seizure was well justified by probable cause and would entitle the defendants to qualified immunity.

■ Fourth Amendment seizure is a discrete event, "effected with force or the threat of it." *United States v. Dionisio*, 410 U.S. 1, 10, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir.2001). A law enforcement officer who neither physically restrains a suspect nor implicitly or explicitly threatens to use force to detain him has not "seized" him within the meaning of the Fourth Amendment. "[O]ne is 'seized' within the fourth amendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state,"*Rucker*

*v. Harford County*, 946 F.2d 278, 281 (4th Cir.1991) (emphasis in original), so as to cause a "termination of [the suspect's] freedom of movement." *Brower v. County of Inyo*, 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ Given this classic formulation of the Fourth Amendment, "seizure" has no application to non-physical restraints. "The view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." *Nieves*, 241 F.3d at 55. Though a summons may impose a burden, a defendant summoned to appear in a criminal case faces no greater restraint than the person summoned for any number of a host of civic responsibilities. *Dionisio*, 410 U.S. at 9–10, 93 S.Ct. 764. A subpoena before a grand jury, a testimonial subpoena, or a call to jury duty each threatens "the possibility of confinement if [one] fails to appear in court," but none constitutes a seizure. *Britton*, 196 F.3d at 29–30; *Dionisio*, 410 U.S. at 10, 93 S.Ct. 764. Likewise, the issuance of the summons was not a seizure.

The circumstances in *Britton* are not materially different from the circumstances here. In *Britton*, the Court of Appeals for the First Circuit rejected the claim that the issuance of a subpoena was a "seizure" essentially because-

> [the suspect] merely received a summons in the mail. He was never arrested on the charges at issue. Nothing in the record indicates that he had to post a bond or to limit his travel before the ultimate hearing in which those charges were dismissed for want of prosecution.

*Britton*, 196 F.3d at 29.

■ In Myers' case, Shaver executed the warrant by summoning, not arresting,

Myers; nothing suggests that Myers had to post bond or limit his travel before the court heard the charges and dismissed them. It follows that Shaver did not "seize" Myers within the meaning of the Fourth Amendment.[3]

■ Even if the service of the summons and surrounding events amounted to a seizure under the Fourth Amendment, that seizure was not unreasonable. The Fourth Amendment proscribes only unreasonable, unjustified seizures. The constitution does not guarantee only the guilty will be arrested. *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). By the time Shaver sought and obtained the warrant he clearly had probable cause to charge Myers with violating Virginia Code § 18.2—282. Although Paula now denies telling Shaver that Myers pointed the pistol at her, Shaver knew that Myers had a heated argument with Paula, had a pistol in his hand, and told Paula he would kill her or she could kill him. Shaver also spoke with Paula's mother in an earlier phone conversation, in which she told him that Myers had pointed a gun at her daughter.

Nevertheless, whether Myers pointed the pistol is not material to the issue of whether Shaver had probable cause. Section 18.2—282 does not require brandishing. Nor does Paula's assertion that she was not afraid dispose of probable cause. A police officer investigating a domestic dispute reasonably could have concluded from the other evidence that Paula was covering for her husband or intimidated by him. It takes very little insight to recognize that a technical, non-practical definition of probable cause could have disastrous consequences. Wisely, "the determination and existence of probable cause is a 'practical, nontechnical conception,' and it involves 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gomez v. Atkins,* 296 F.3d 253, 262 (4th Cir.2002) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). With those precepts in mind, Myers' contention that Shaver lacked probable cause rings especially hollow.[4]

The court also finds the defendants entitled to qualified immunity on the claim that they lacked probable cause to obtain a warrant. The court will not belabor the issue any further than to state that in reaching this result, the court applies "the qualified immunity analysis, which examines the objective reasonableness of an officer's conduct," *Smith v. Reddy,* 101 F.3d 351, 355 (4th Cir.1996), rather than the subjective standard of *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

## IV.

■ To the extent that Myers raises a § 1983 malicious prosecution claim, that claim is equally without merit. Although Myers alleges that defendants prosecuted him without probable cause, he cannot es-

---

**3.** *See infra* note 5.

**4.** Myers argues that the warrant was invalid because it was based on a complaint containing a factual misstatement: the statement that Paula told Shaver that Myers pointed the pistol at her. Thus, as Myers views it, probable cause is lacking because he only held, not brandished, the pistol during his heated argu- ment with his wife in which he concededly stated that he could kill her or she could kill him. As the court has pointed out, however, § 18.2—282 does not require brandishing. Thus, the alleged inaccuracy is not material to the finding of probable cause or the warrant's validity.

tablish that defendants seized him within the meaning of the Fourth Amendment, a prerequisite to his § 1983 malicious prosecution claim.

> [T]here is no such thing as a " § 1983 malicious prosecution' claim. What [the Fourth Circuit has termed] a 'malicious prosecution' claim ... is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous, common law tort of malicious prosecution-specifically, the requirement that the prior proceeding terminate favorably to the plaintiff. It is not an independent cause of action."

*Lambert v. Williams,* 223 F.3d 257, 262 (4th Cir.2000) (citations omitted), *cert. denied,* 531 U.S. 1130, 121 S.Ct. 889, 148 L.Ed.2d 797 (2001). Accordingly, Myers' § 1983 malicious prosecution claim fails because it lacks an essential element.[5]

### V.

■ Myers' claim arising out of the emergency protective order, which sounds in procedural due process, fares no better than Myers' other claims. Due process is a flexible concept which calls for only those "procedural protections as the particular situation demands." *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (citations omitted).

Due process does not shackle common sense. A law-enforcement officer armed with credible information that a suspect recently engaged in potentially life-threatening domestic abuse is fully justified in seeking a restraining order without giving the suspect advance notice. A prompt hearing a short time after the judicial officer issues the protective order, such as the one provided by Virginia Code § 16.1–253.4, which Myers took advantage of less than 24 hours after Shaver served the order on him, is quite sufficient to satisfy due process given the necessary flexibility due process provides. Without a doubt, it is perfectly reasonable for Virginia to provide for ex parte emergency protective orders, and for Shaver to have sought such an order under the circumstances he confronted.

Shaver was not acting as an officious intermeddler in a personal family dispute. He had probable cause to believe that Myers had recently engaged in domestic abuse. It is no trifling matter for a spouse to inject a firearm into a heated argument. Indeed, this court would be acting recklessly if it failed to accord these realities and Shaver's actions considerable deference. Clearly, Virginia's statute is sound, Shaver acted reasonably, and Myers received all of the process the Constitution required.

---

5. The Fourth Circuit soundly rejected the concept of a "continuing seizure" in *Riley v. Dorton,* 115 F.3d 1159, 1163 (4th Cir.1997) (en banc) (quoting *California v. Hodari D.,* 499 U.S. 621, 625, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)) (noting that "[a] seizure is a single act, and not a continuous fact."). Fourth Amendment jurisprudence has nothing to say about the actions of a court following the issuance of a summons. Thus, a pretrial release condition imposed by a judicial officer is not a Fourth Amendment seizure.

Later events, those following the institution of charges, that are subject to the court's control, are best viewed through a due process prism. *Riley,* 115 F.3d at 1162. Thus, this court has held that a suspect arrested on a warrant following the return of an indictment procured through perjury by a law enforcement officer cannot assert a Fourth Amendment claim under § 1983 against that officer. *Witt v. Harbour,* 508 F.Supp. 378 (W.D.Va.1980). Of course, the Fourth Amendment would have been precisely the right vehicle had that officer seized that suspect before the return of the indictment. *See Witt,* 508 F.Supp. at 380 n. 2.

## VI.

According to Myers' final claims, the defendants violated his right to procedural due process when they suspended him without pay and refused to reimburse him for the annual leave he used during his suspension. The court finds that defendants have qualified immunity for the first of these claims and that the second is not of a constitutional magnitude.

### A.

■ Since neither the United States Supreme Court nor the Fourth Circuit has decided whether disciplinary action short of termination entitles an employee to notice and a hearing before the employer acts, qualified immunity shields defendants from Myers' claim that they suspended him without pay. *Gilbert v. Homar* is instructive. 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997).

The plaintiff in *Gilbert* was employed at a state university in Pennsylvania as a police officer. The state police charged plaintiff with a drug related criminal offense and notified his supervisor who, in turn, informed the university's human resources director. The human resources director immediately suspended the plaintiff without pay pending further investigation. About a week later, the trial court dismissed the charges. More than three weeks passed before the university gave the plaintiff an opportunity to tell his side of the story, and shortly thereafter it demoted him. The plaintiff filed a § 1983 action in United States District Court for the Middle District of Pennsylvania alleging that the university's failure to provide him with notice and an opportunity to be heard before suspending him without pay violated his right to procedural due process. The District Court entered summary judgment for defendants, and the Third Circuit reversed.

In reversing, the Supreme Court found no due process violation. The Court noted that "[it had] not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert*, 520 U.S. at 929, 117 S.Ct. 1807. It then essentially reasoned that the initial finding of probable cause to support criminal charges against an employee together with the opportunity for a prompt post-suspension hearing ordinarily is a sufficient check on erroneous decision making to justify suspending the employee without first giving him an opportunity to be heard, especially in light of the substantial public interest at stake when the state charges a police officer with a serious criminal offense. *Id.* at 931–32, 117 S.Ct. 1807.

There are no doubt obvious similarities between the material facts in *Gilbert* and the present case. Whether there are material differences is debatable, and that is precisely the point. The court finds no bright line rule in this murky area of due process jurisprudence sufficient to warn defendants that they were violating the Constitution's due process clause. Accordingly, qualified immunity shields them from liability.

### B.

■ The finding of qualified immunity makes it unnecessary to determine whether due process required notice and a hearing before Myers' suspension and subsequent use of annual leave. It is a separate question, however, whether the state should now reimburse him for those benefits. *See Phelps v. Anderson*, 700 F.2d 147, 148 (1983). Assuming, without deciding, that defendants wrongfully forced

Myers to use his annual leave while suspended without pay, due process is satisfied by an adequate post-deprivation remedy.[6] *See, e.g., Phelps,* 700 F.2d at 148–49 (1983). Myers had, and continues to have, the opportunity to redress this grievance. First, he sent letters to the Internal Affairs Section and to Shaver and convinced the Department to change his status from "suspension without pay" to "paid administrative leave." Myers Letters, Feb. 8, 2001 and Feb. 14, 2001 at 1 (Def.'s Mem. in Supp.: Attachs. 11 and 12 of Ex. 1 to Attach. 3). Second, he had access to an employee grievance procedure through the Virginia Department of Employment Dispute Resolution while employed by the Department. Qualification Ruling of Director at 2 (Pl.'s Br. in Opp'n: Attach. I). Lastly, he had the right to pursue the claim in state court. *Phelps,* 700 F.2d at 149. A procedural due process claim lies when property is taken without adequate safeguards to remedy the use of arbitrary authority. The court is satisfied that these remedies are substantial, not simply adequate. It follows that the claim lacks merit.

**6.** The court does not view a failure-to-reimburse claim as a stand-alone constitutional claim. If procedural due process is not implicated in the taking or if there has been no taking at all, the Constitution has nothing to do with the controversy. A claim for reimbursement of annual leave contains no recognizable constitutional component. Indeed, if reimbursement claims were constitutionally significant, run-of-the-mill contractual disputes between public employers and their employees would become grist for the § 1983 mill. But even if a failure-to-reimburse claim could be considered a stand-alone constitutional claim, an intentional, unauthorized deprivation of property by a state employee violates due process only if no meaningful post-deprivation remedy is provided. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Rodriguez–Mora v. Baker,* 792 F.2d 1524, 1527 (11th Cir.1986).

## VII.

For the reasons stated, the court will enter summary judgment for defendants.

### *AMENDED FINAL ORDER*

In accordance with the accompanying memorandum opinion entered February 19, 2003, it is **ORDERED** and **ADJUDGED** as follows:

1) Summary judgment is **GRANTED** and **ENTERED** in favor of defendants and against plaintiff; and

2) all defendants are hereby **DISMISSED** from this suit with prejudice.

This case is stricken from the active docket of this court.

There is also another substantial reason Myers cannot recover on this claim in federal court. Reduced to its logical underpinning it is simply a claim that a department of the Commonwealth of Virginia owes Myers money. Myers seeks to force defendants to reimburse him for unpaid annual leave. Defendants, however, can reimburse nothing in their individual capacities. This claim, therefore, is nothing less than a claim against the state for money. Of course, the Eleventh Amendment precludes such a claim in federal court. The claim is markedly different than the claim that defendants violated Myers' rights to procedural due process when they suspended him without pay, for which Myers seeks compensatory damages from the defendants.